447 P.2d 248

**O. S. STAPLEY COMPANY, an Arizona corporation, Seth Smith Boat Works, Inc., an Arizona corporation, American Chain and Cable Company, a New York corporation, Appellants and Cross-Appellees,**

v.

**Elizabeth (Hartzell) MILLER, a/k/a Elizabeth Miller Proulx, Appellee and Cross-Appellant,**

and

**O. S. Stapley Company, an Arizona corporation, Seth Smith Boat Works, Inc., an Arizona corporation, American Chain and Cable Company, a New York corporation, Appelles and Cross-Appellants.**

No. 9100–PR.

Supreme Court of Arizona.

In Banc.

Nov. 20, 1968.

Moore, Romley, Kaplan, Robbins & Green, by Robert H. Green, Kenneth J. Sherk, Phoenix, for Seth Smith Boat Works, Inc.

Snell & Wilmer, by Roger W. Perry, Arthur P. Greenfield, Phoenix, for O. S. Stapley Co.

Fennemore, Craig, vonAmmon, McClennen & Udall, by Linwood Perkins, Jr., Phoenix, for American Chain and Cable Co.

Langerman, Begam & Lewis by Samuel Langerman, Robert D. Myers, Phoenix, for Elizabeth Miller Proulx.

John J. Dickinson, Phoenix, for amicus curiae, The American Trial Lawyers Ass'n.

LOCKWOOD, Justice:

On August 22, 1960, the plaintiff, Elizabeth (Hartzell) Miller, accompanied one Harry Hartzell and others to Canyon Lake in Arizona for the purpose of water skiing. After arriving at the lake, the boat was operated for approximately an hour without incident. At the time of the accident, Hartzell and another member of the party were being pulled by the boat while they water-skied. Plaintiff was "ob-

server" and was sitting on the dash of the boat facing the skiers so that she might inform the boat operator as to what the skiers were doing. The driver of the boat at that time, one Villalpondo, felt that the plaintiff was not sitting in a safe position and asked her not to sit on the dash board. Plaintiff however, was holding on to a tubular rail which ran along the deck and felt that she was in a safe position. While proceeding straight ahead at approximately twenty-five miles per hour, the boat suddenly veered sharply throwing the plaintiff into the water and causing the propellor of the outboard motor to strike her right foot, inflicting serious damage.

The plaintiff based her claim on the alleged faulty steering system of the boat and brought suit against Villalpondo, (the operator of the boat), the O. S. Stapley Company, (retailers and installers of the boat's steering system), the Seth Smith Boat Works, Inc., (intermediate sellers of the steering system), and American Chain and Cable Company, (manufacturers of the steering system). The claim against Villalpondo was dismissed at the beginning of the trial.

Plaintiff contended that the cause of the accident and of her injuries was the apparent failure of a part of the steering system called the "quick disconnect". After the evidence was presented, the trial judge ruled, over defendants' objections, that the issue of contributory negligence would not be submitted to the jury. The court directed a verdict on the issue of negligence against the plaintiff and in favor of O. S. Stapley and Seth Smith Boat Works. The court also directed verdicts for the plaintiff on the issue of strict tort liability against O. S. Stapley, Seth Smith Boat Works, Inc. and American Chain and Cable Company. O. S. Stapley had cross-claimed for indemnity against Seth Smith, and both O. S. Stapley and Seth Smith had crossed-claimed for indemnity against American Chain. The court directed verdicts in favor of the cross-claimants. After the jury verdict the court sustained American Chain's objection to the statement of costs filed by Seth Smith and O. S. Stapley and American Chain. All the parties appealed, and plaintiff filed a "Conditional Cross-Appeal" on the issue of negligence.

Harry Hartzell purchased his boat and outboard motor for the purpose of water skiing from the O. S. Stapley Company in Chandler, Arizona. Hartzell placed his order with the manager and it was agreed that a seventy-five horsepower outboard motor and the steering system would be installed on the boat by the manager with some assistance from Hartzell himself. The seventy-five horsepower outboard motor was a new motor on the market and the American Chain and Cable Company had not yet manufactured a "SteerMaster" steering system capable of use with the higher powered machine. The "Steer-Master" kit to be used on the Hartzell boat was originally designed and manufactured for a thirty-five horsepower or fifty horsepower motor. Thus, to facilitate the increased horsepower, it became necessary to alter the "SteerMaster" kit.

After the steering system was installed the boat was delivered to Hartzell. Before Hartzell took possession of the craft, American Chain came out with a new "Steer-Master" kit for a seventy-five horsepower motor such as Hartzell was using. Even though Seth Smith was aware of the new kit and of Hartzell's situation, Hartzell was not informed of its availability.

The boat was used regularly over a period of weeks until the time of the accident. Hartzell testified that on the day of the accident he engaged the parts of the "quick disconnect" after the boat was launched. The boat was then operated with and without skiers for about one hour before the mishap took place. Immediately after the accident occurred and the plaintiff was brought back on board, Hartzell observed that the two units of the "quick disconnect" were separated. There was apparently no visible damage to the "quick disconnect".

When the "quick disconnect" is disengaged, it is impossible to control the direction of the boat from the driver's seat. This is because the "quick disconnect" is a necessary link between the steering wheel and the motor (with the motor serving as both a source of power and as the rudder). The purpose of the "quick disconnect" is to provide a method of separating the motor from the steering system such as when the motor is titled into a carrying or trailering position or when the motor is removed from the boat. To separate the ball stud of the "quick disconnect" from the socket portion of the unit, the "quick disconnect" is designed with a retracting spring lock sleeve which surrounds the socket. By retracting this sleeve the ball stud is removed from the cavity in which it rests. The evidence produced at trial indicated that as the "SteerMaster" was constructed, if a sufficient vertical force was applied to the socket part of the "quick disconnect" (viz. by the bridle, pulley or tow rope coming in contact with the "quick disconnect", or by interference or binding of certain parts of the motor or steering assembly), the "quick disconnect" could be quickly disconnected.

One of the main issues raised by the parties to this action was whether or not the doctrine of "Products Liability" or "Strict Tort Liability" applies in Arizona. In the recent case of Shannon v. Butler Homes, Inc. 102 Ariz. 312, 428 P.2d 990 (1967) we stated:

"The liability of a manufacturer of an article is in tort (see Phillips v. Anchor Hocking Glass Corp., 100 Ariz. 251, 413 P.2d 732, and concurring opinion of Justice Lockwood in Nalbandian v. Byron Jackson Pumps, 97 Ariz. 280, 399 P.2d 681), and it is not assumed by agreement but imposed by law. Crystal Coca-Cola Bottling Co. v. Cathey, 83 Ariz. 163, 317 P.2d 1094." 102 Ariz. at 315, 428 P.2d at 993.

The concurring opinion in the 1965 case of Nalbandian stated in part:

"In the recent case of Colvin v. Superior Equipment Company, 96 Ariz. 113, 392 P.2d 778 (1964), this Court adopted the modern legal concept of a manufacturer's strict liability in tort with regard to its manufactured products." 97 Ariz. at 287, 399 P.2d at 686.

The American Law Institute's Restatement of the Law of Torts, (Second), (1965) states in § 402 A:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Comments c, d, j, 1 and p state:

"c. On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which

liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products."

"d. The rule stated in this Section is not limited to the sale of food for human consumption, or other products for intimate bodily use, although it will obviously include them. It extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer * * *."

"j. *Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use * * *.

"Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

"1. *User or consumer.* In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller * * * He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser * * *."

"p. *Further processing or substantial change.* Thus far the decisions applying the rule stated have not gone beyond products which are sold in the condition, or in substantially the same condition, in which they are expected to reach the hands of the ultimate user or consumer. In the absence of decisions providing a clue to the rules which are likely to develop, the Institute has refrained from taking any position as to the possible liability of the seller where the product is expected to, and does, undergo further processing or other substantial change

after it leaves his hands and before it reaches those of the ultimate user or consumer.

"It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this Section * * *. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes * * *."

■ Applying this to the case before us, we further hold that it was error for the trial court to direct a verdict on the issue of strict liability in favor of the plaintiff against the various defendants. It is clearly apparent that the product failed to reach the user without some change which may have been substantial, and it is conceivable that such alteration may have been the proximate cause of the accident and of the plaintiff's injuries. The trial court erred in refusing to submit this issue to the jury.

■ Since we have held that it was error to direct a verdict against American Chain, it must necessarily follow that the directed verdicts in favor of O. S. Stapley against Seth Smith, and in favor of both O. S. Stapley and Seth Smith on their cross-claims against American Chain were also erroneous. Further there is sufficient evidence in the record to justify submission of the issue of possible negligence of O. S. Stapley and Seth Smith to the jury. Therefore, it was reversible error to direct verdicts on the issue of negligence in favor of O. S. Stapley and Seth Smith. See, Heth v. Del Webb's Highway Inn, 102 Ariz. 330, 332, 429 P.2d 442, 444 (1967).

■ We now reach the question of whether contributory negligence forms a defense under products liability. There appear to us to be at least three separate divisions of what is loosely termed "contributory negligence" by some courts [1] in prod-

1. See, e. g. 4 A.L.R.3d 501 (1965).

ucts liability cases: These are: (1) failure to discover a defect in the product which the plaintiff should, if he was reasonably diligent, have discovered; (2) notwithstanding the discovery of such a defect, the plaintiff nevertheless uses the article; and (3) the plaintiff uses the product for certain purposes or in a manner not reasonably foreseen by the manufacturer. Using classical definitions, it becomes readily apparent that category number one is contributory negligence and category number two is assumption of risk. Category number three falls under what could be called the doctrine of "unanticipated use" or "misuse". Epstein, Products Liability: Defenses Based On Plaintiff's Conduct, 1968 Utah Law Review 267, 268–270 (May, 1968).

■ Keeping these distinctions in mind, those cases which on their face appear to be in conflict as to whether contributory negligence should be a defense in an action for strict liability can be reconciled:

> "The cases appear to be in disagreement as to whether contributory negligence of the plaintiff bars his recovery in an action for strict products liability. In general, however, they can be reconciled by adverting to the customary distinction between contributory negligence and assumption of risk. If the plaintiff's negligence was in failing to discover the unsafe condition of the product he can usually recover; if his negligence was in continuing to use the product after learning of the danger condition, his recovery is usually barred." 19 Sw.L.J. 5, 21–22 (1965).

Comment n of § 402 A, Restatement of Torts (Second), draws a similar distinction:

> "n. *Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. *Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to*

*guard against the possibility of its existence.* On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery." (Emphasis supplied.)

We hold that contributory negligence, as defined above, is not a defense under the products liability doctrine and we emphasize that no duty rests upon the ultimate consumer or user to search for or guard against the possibility of product defects.

American Chain maintained on appeal that it should have been permitted to present the testimony of George L. Ellis, a "boat builder with a background in engineering", and Charles D. Strang, a "mechanical engineer who does consulting work primarily in the marine field". According to an offer of proof the testimony of these proposed witnesses would be in regard to the cause of the accident, i. e. that the propellor would not have been damaged had it struck only the plaintiff's foot; therefore, a relatively solid and dense submerged object had been struck by the propellor at the time of the accident inasmuch as it was in a badly damaged condition immediately thereafter, and had the steering assembly included the correct tiller kit a full motor tip-up without any prying action would have resulted when the underwater object was struck and there would have been no loss of steering.

Plaintiffs' witnesses were permitted to testify regarding the cause of the accident and American Chain sought a continuance to meet this testimony, which was denied. However, we need not discuss this, as we are remanding this case for a new trial and this issue will no longer be a problem as the parties are now fully aware of the potential testimony of each other's experts.

The trial court disallowed the respective claims for costs of the plaintiff, of Seth Smith and of O. S. Stapley, which costs were incurred in taking certain depositions. Arizona Rules of Civil Procedure, Rule 54(f) 16 A.R.S. give the trial judge the discretion in awarding costs to the "prevailing party". Since we have found that it was error to direct verdicts against the defendants as to liability, there are no longer any "prevailing parties" to whom the awards may be given and thus this question raised on appeal becomes moot.

The opinion of the Court of Appeals, 6 Ariz.App. 122, 430 P.2d 701 (1967) is vacated, and the judgment of the trial court is reversed and the case is remanded for a new trial.

McFARLAND, C. J., UDALL, V. C. J., and STRUCKMEYER and BERNSTEIN, JJ., concur.