782 P.2d 1187

**DILLARD DEPARTMENT STORES, INC., a Delaware corporation; and Dayton Hudson Corporation, Defendants–Appellants,**

v.

**ASSOCIATED MERCHANDISING CORPORATION, a foreign corporation, Defendant–Appellee.**

**No. 1 CA–CV 88–125.**

Court of Appeals of Arizona, Division 1, Department A.

Nov. 9, 1989.

Shannon & Cronin by John A. Shannon, Jr., Phoenix, for defendants-appellants.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Larry L. Smith and George H. Mitchell, Phoenix, for defendant-appellee.

JACOBSON, Presiding Judge.

The sole issue in this appeal is whether a broker which neither sold, manufactured, distributed, nor had any ownership or control over a product and which made no profit from its sale but which brought the manufacturer and seller together can be strictly liable for injuries resulting from that defective product. The trial court held that it could not, and granted summary judgment in favor of the broker. For the reasons expressed below, we affirm.

## FACTS

The material facts are not in dispute. The plaintiff, Roger DeFrane, who is not a party on this appeal, was injured by a defective strap on a piece of luggage purchased at appellant, Dillard Department Stores, Inc. (Dillard).[1] The manufacturer of the luggage is not known at this time. As far as the parties have told us, the only contact with this transaction by appellee, Associated Merchandising Corporation (AMC), was to bring Dillard and the manufacturer of the product together.[2] AMC is a nonprofit organization composed of member department and specialty stores. In exchange for membership fees paid by its member stores, AMC provides "buying services and merchandise management." These services include putting member stores in contact with manufacturers as potential sources of products the stores

---

1. When DeFrane purchased the luggage, Dillard was known as Diamonds. For convenience, all references will be to Dillard.

2. Apparently AMC also arranged for the payment by Dillard and for transportation of the merchandise to the United States.

wish to retail. AMC does not take title to or sell any merchandise. Rather, it only assists member stores in finding potential sources for products desired which are then purchased directly from the manufacturer of their choice.

With respect to the suitcase in question, AMC put Dillard in touch with the manufacturer. Dillard purchased the suitcase directly from the manufacturer and, in turn, sold it to plaintiff DeFrane.

■■■ DeFrane filed a complaint against Dillard, Dillard's parent company, Dayton Hudson Corporation, and AMC, alleging they were strictly liable for his injuries. AMC moved for summary judgment on the basis that, as a broker, it should not be strictly liable within the meaning of § 402A, *Restatement (Second) of Torts,* (1965). DeFrane and Dillard both opposed the motion, which the trial court granted. Only Dillard appeals.[3]

### DISCUSSION

■ Dillard contends that because Arizona has adopted the enterprise theory of liability, a broker, who is in the chain of distribution of a defective product reaching and injuring the consumer, is strictly liable.

Dillard's contention that strict liability is based upon a theory of enterprise liability is found in *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.,* 135 Ariz. 309, 660 P.2d 1236 (App.1983). In *Jordan,* the issue was whether a seller of used products could be strictly liable under the "seller" definition of § 402A, *Restate-*

*ment (Second) of Torts.* In resolving this issue, *Jordan* adopted the reasoning set forth in *Tucson Industries, Inc. v. Schwartz,* 108 Ariz. 464, 467–68, 501 P.2d 936, 939–40 (1972):

> Strict liability is a public policy device to spread the risk from one to whom a defective product may be a catastrophe, to those who marketed the product, profit from its sale, and have the know-how to remove its defects before placing it in the chain of distribution.

*Jordan,* 135 Ariz. at 315, 660 P.2d at 1242.

From this policy statement, which appears to be the underlying rationale of § 402A *Restatement* liability, *see* comment c, *Jordan* makes the statement that "the basis for strict liability in Arizona is the enterprise liability theory." 135 Ariz. at 315, 660 P.2d at 1242.

Unfortunately, *Jordan* does not explain what the enterprise liability theory is or how that theory, if different from the rationale expounded in § 402A *Restatement,* is germane to imposing liability on a seller of used products. In fact, there are two legal theories which have the title of "enterprise liability." The theory which we assume was referred to in *Jordan* had its full exposure in a law review article authored by Professor Howard C. Klemme, entitled *The Enterprise Liability Theory of Torts,* 47 U.Colo.L.Rev. 153 (1976).[4] Professor Klemme, like Einstein in his attempt to construct and verify a unifying force theory of the universe, attempted to find a "unifying rationale" of tort liability.

---

**3.** This court, on its own motion, raised the issue whether Dillard, in the absence of a cross-claim against AMC, was an "aggrieved party" who would have standing to appeal from an order granting summary judgment in favor of its co-defendant. *See* Rule 1, Arizona Rules of Civil Appellate Procedure. AMC responded to our request for supplemental briefing with a concession that it agreed Dillard was a proper appellant because the trial court's ruling would bind Dillard through the doctrine of *res judicata* in any subsequent litigation, such as a claim for contribution. Dillard did not submit any supplemental briefing.

We note that lack of standing is not a jurisdictional defect in a state court appeal; thus, if appellee does not assert the issue, we may consider the merits of appellant's claim without

deciding the issue of standing. *State v. B Bar Enterprises, Inc.,* 133 Ariz. 99, 101 n. 2, 649 P.2d 978, 980 n. 2 (1982). We therefore address the substantive issue raised on appeal without deciding the standing issue.

**4.** The other theory of "enterprise liability" concerns itself with imposing liability where the plaintiff is unable to show causation, that is, that the product producing the injury was manufactured by the defendant. *See generally Namm v. Charles E. Frosst & Co., Inc.,* 178 N.J.Super. 19, 427 A.2d 1121 (App.Div.1981); *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 505 A.2d 973 (1985); *Mulcahy v. Eli Lilly & Co.,* 386 N.W.2d 67 (Iowa 1986); *Davis v. Yearwood,* 612 S.W.2d 917 (Tenn.App.1980).

Based upon Professor Guido Calabresi's theory of economics,[5] Klemme espoused the theory that all tort liability could be explained in terms of enterprise liability, that is, that liability can be assessed under principles of economics:

> In short, the theories of liability which the tort law uses for the purpose of deciding whether the loss should be left on the plaintiff or reallocated to the defendant will also determine how such losses, or costs, are to be distributed among various segments of the society. In almost all instances these losses will be reflected as costs in the pricing mechanism of the market place and ultimately in the allocation of the community's resources and in the distribution of its wealth among its members.

*Id.* at 161.

> The rules of liability and nonliability of the tort law therefore function in most instances as cost accounting, i.e., cost distribution rules. In large measure they determine who will ultimately, through the pricing mechanism of the market place, bear the costs of the tort losses generated by the numerous activities people carry on in society.

*Id.* at 162.

Like Einstein's, Klemme's theory is not wholly satisfactory. While helpful in explaining the allocation of losses in respondeat superior cases and in product liability cases, cost accounting rules do little to settle the liability issue of the two motorists who simultaneously enter the same intersection.

In any event, the underlying rationale utilized by Klemme in espousing the enterprise theory is worth analyzing for it bears on the issue here, the liability of one in the "chain of distribution." Klemme theorizes that liability should be imposed on two levels: (1) ultimately on "the economic beneficiaries of the enterprise," and (2) initially upon "that category of participants within the enterprise which is in the most effective position to cause the enterprise to take preventive action and to pass on most efficiently the alternative costs of preven-

tion...." *Id.* at 186. These twin criteria of economic benefit and preventive action echo the rationale of most courts adopting strict liability. *See Tucson Industries, Inc. v. Schwartz, supra.*

Based upon this type of analysis, AMC argues that, because it never took title to the suitcase and never exercised any control over it, it neither derived an economic benefit from the transaction nor was it in a position to exercise any control over the quality of the product or influence its quality. Therefore, AMC argues it should not be strictly liable. (AMC tacitly admits that it would be liable for its negligence, if any, in handling the transaction.) Cases cited by AMC support its position.

In *Tauber–Arons Auctioneers Co., Inc. v. Superior Court*, 101 Cal.App.3d 268, 161 Cal.Rptr. 789 (1980), the issue was whether an auctioneer of an allegedly defective "belt drive planer" was strictly liable for injuries incurred in using the planer. The auctioneer was paid a flat fee for its services which included selling all the factory machinery of an engineering firm, of which the planer was part. Title to the machinery passed directly from the engineering firm as seller to the buyer at auction. The auctioneer's sole contact with the product was to conduct the sale. *Id.* at 270–71, 161 Cal.Rptr. at 790–91. The court held that since the auctioneer had no "participatory connection with the enterprise which 'created consumer demand for and reliance upon' the particular ... product," *id.* at 276, 161 Cal.Rptr. at 793 (citation omitted), and since it "played no more than a random and accidental role in the distribution of the ... planer," *id.* at 284, 161 Cal.Rptr. at 798, the rationale for applying strict liability was not present. *Id.*

Likewise, a New Jersey court refused to hold a broker who distributed DES from the manufacturer to a company that converted it to pill and capsule form strictly liable for resulting injuries. *Lyons v. Premo Pharmaceutical Labs, Inc.*, 170 N.J. Super. 183, 406 A.2d 185 (App.Div.1979). The *Lyons* court reasoned:

**5.** As pointed out in the dissent, this theory may   have many parents. *See* dissent, footnote 7.

There is no doubt that [the broker] was, in a sense, in the chain of distribution and contributed to placing the product in the stream of commerce. But *it must be shown that it exercised control over the product....*

It is undisputed that [the broker] never had physical control over the DES. It merely arranged the sale; the drug was shipped directly from [the manufacturer] to [the distributor].

406 A.2d at 192 (citation omitted) (emphasis added). The court concluded that, in light of the passive role the broker played, it could not be held strictly liable. *Id.*

Finally, a federal court, applying Minnesota law, refused to hold a pattern maker strictly liable for suggesting a fabric, later proven defective, as suitable for use in conjunction with its pattern. *Abel v. J.C. Penney Co., Inc.*, 488 F.Supp. 891 (D.Minn. 1980), *aff'd*, 660 F.2d 720 (8th Cir.1981). In striking the cause of action against the pattern company, the *Abel* court reasoned:

It is one thing to hold someone liable for placing an injury-producing defective product on the market. It is quite another thing to hold someone liable for suggesting that another's product may be one of several suitable for use.... As in the case at hand, the manufacturer and retailer can absorb and pass on the cost of the injuries which their products cause. They are also in a much better position than the pattern manufacturer *to reduce or eliminate the hazard created* [from the suggested fabric].

Section 402A recognizes this. It does not impose liability [on] 'one who sells or suggests the use of,' but merely 'one who sells.'

*Id.* at 895.

Moreover, courts have required more of a "participatory connection" than was present here. The California Court of Appeals points out:

It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's le-

gal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability.

*Kasel v. Remington Arms Co.*, 24 Cal. App.3d 711, 725, 101 Cal.Rptr. 314, 323 (1972). Here, AMC's "participatory connection" is simply missing. It is undisputed that AMC had neither ownership nor possession of the luggage nor the opportunity to inspect, examine, or otherwise exercise control over it. AMC essentially provides a service to retailers, rather than specific goods to the public. AMC did not make a commission, profit, or otherwise directly benefit from the specific transaction resulting in Dillard's purchase of the luggage from the manufacturer. Furthermore, Dillard does not contend that AMC would have had any responsibility if the luggage had been lost or damaged during transit between the manufacturer and retailer. Additionally, AMC's role in that transaction hardly created any consumer reliance as to the type of product or its quality. *See, e.g., Kasel v. Remington Arms Co.*, 24 Cal.App.3d at 725–26, 101 Cal.Rptr. at 323–24.

■ Strict liability, which imposes liability without consideration of fault, that is, negligence in the production or distribution of the product, should only be assessed against those defendants who satisfy the policy consideration giving rise to the doctrine. The dissent takes the position that AMC qualifies as a "seller," because the majority treats AMC as a "seller." Nothing can be further from the rationale expressed by this opinion. It is because AMC has none of the attributes possessed by a "seller" that it is not strictly liable. Merely pointing to an entity which is in the "stream of commerce" or part of the "enterprise" is not enough. If it were, the trucking company which hauled the product from the manufacturer to the retailer would be strictly liable, as would the newspaper which advertised the product which induced the consumer to buy. Here the dual concepts of profitable venture and preventive action do not apply to the role

played by AMC in this transaction. Hence, the policy underlying the doctrine of strict liability is not satisfied by imposing that doctrine on AMC.

Judgment affirmed.

LEVI RAY HAIRE, Judge Retired, concurs.

NOTE: The Honorable Levi Ray Haire, retired, was authorized to participate in this appeal by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. 6, § 20, and A.R.S. § 38–813.

CLABORNE, Judge, dissenting.

I respectfully dissent. The facts related by the majority are correct. Although Associated Merchandising Corporation (AMC) did not take title to nor sell the luggage in this case, it did arrange for the payment and the transportation of the luggage into this country.[6] One of the functions of AMC, which was owned by a number of department stores, including Dillards, was to arrange for merchandise to be acquired by the member store and arrange for transportation of the merchandise to the department store for sale. It was after this participation by AMC that Dillard Department Stores, Inc. (Dillards) became involved in the marketing of the defective luggage. I am not concerned with theoretical physics but with whether Arizona has adopted the "enterprise theory" of strict liability and if that doctrine applies to these facts.

Whatever the origin of the theory, strict liability is based upon public policy considerations:

Who should bear the loss? The injured member of the public or those persons who are in the chain of *placing* defective goods on the market. We choose to protect the member of the public since those

involved in the chain of marketing can distribute the risk between themselves by means of insurance and indemnity agreements.

*Caruth v. Mariani,* 11 Ariz.App. 188, 192, 463 P.2d 83, 87 (1970) (emphasis supplied). This exposition of the rationale behind the application of strict liability in Arizona has been specifically approved not only in *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.,* 135 Ariz. 309, 660 P.2d 1236 (App.1983), but also in *Tucson Industries Inc. v. Schwartz,* 108 Ariz. 464, 501 P.2d 936 (1972). The Restatement codifies this rationale. Restatement (Second) of Torts § 402(A) (1964).

The majority seems to take the position that if an enterprise does not take title, exercise control or derive some direct economic benefit from the defective product, the enterprise should not be strictly liable. This is so, they say, even though the enterprise has clearly placed the defective product in a market that would reach a consumer. Yet comment c to § 402(A), Restatement (Second) of Torts, speaks clearly to this issue:

On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries *caused by products intended for consumption be placed upon those who market them,* and be treated as a cost of production against which liability

---

6. Interrogatory answer given by appellee AMC:
2. List the name, address and telephone number of any distribution entity who handled the subject luggage from the time of manufacture to its distribution to Associated Merchandising Corporation or Dillards. (As noted in the Instructions, all references to Dillards include not only Defendant Dillard Department Stores, Inc., but also Diamonds Department Stores.)

We do not have sufficient information as to the particulars of the item in question to allow us to respond. Diamond's purchased the item from the manufacturer and AMC acted as Diamond's agent in arranging for the payment & for [sic] the transport of the merchandise to the U.S.A.

insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who *market the products.*

Restatement (Second) of Torts § 402(A) comment c (emphasis supplied).

The policy considerations underlying the imposition of strict liability deal with maximum protection to the consumer rather than "control" by the seller. In *Zamora v. Mobil Corp.,* 104 Wash.2d 199, 704 P.2d 584 (1985), a distributor, Cal Gas Corporation, obtained summary judgment claiming it was only a distributor *who never had control or possession of the defective product* and who bought and sold the product completely as a paper transaction. The Washington Supreme Court reversed, saying in part:

> Additionally, the policies underlying the imposition of strict liability justify its imposition in this case. The primary policy justification recognized by this court for the extension of strict liability to all sellers in the chain of distribution is provision of the "maximum of protection" to the consumer. The sellers are then required to argue among themselves any questions as to their respective liability. *That policy rationale is as applicable to sellers who never handle or control the product as it is to those sellers who do possess or control the product.* In either case, consumer protection is the ultimate factor considered by this court....

*Id.* at 204, 704 P.2d at 589 (citation omitted) (emphasis supplied).

There is no dispute that § 402(A) applies whether one is a manufacturer, retail dealer, or distributor. *See* Restatement (Second) of Torts § 402(a) comment f. *See also Kirby v. Rouselle Corp.,* 108 Misc.2d 291, 437 N.Y.S.2d 512 (1981).

The enterprise liability theory is nothing more than a merging together of tort and contract law which establishes a tort standard of strict liability for defective products.[7] Clutterbuck, *Karl Llewellyn and the Intellectual Foundations of Enterprise Liability Theory,* 97 Yale L.J. 1131 (1988).

Arizona courts have long found a variety of entities to be an integral part of an enterprise responsible for consumer injuries caused by defective products: A lessor, *Sequoia Mfg. Co. v. Halec Constr. Co.,* 117 Ariz. 11, 570 P.2d 782 (App.1977); a dealer in used goods, *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.,* 135 Ariz. 309, 660 P.2d 1236 (App.1983); a retailer, *O.S. Stapley Co. v. Miller,* 103 Ariz. 556, 447 P.2d 248 (1968); a jobber, *Tucson Industries, Inc.,* 108 Ariz. 464, 501 P.2d 936 (1972); a distributor, *Lunt v. Brady Mfg. Corp.,* 13 Ariz.App. 305, 475 P.2d 964 (1970); and a packager, *Shell Oil Co. v. Gutierrez,* 119 Ariz. 426, 581 P.2d 271 (App.1978). *See also Torres v. Goodyear Tire & Rubber Co., Inc.,* 867 F.2d 1234, 1238 (9th Cir.1989).

*Brokers* who are instrumental in the chain of distribution are not immune from responsibility. In *Benitez-Allende v. Alcan Aluminio do Brasil, S.A.,* 857 F.2d 26, 33–34 (1st Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1135, 103 L.Ed.2d 196

---

**7.** The enterprise theory is not the product of one man; its parents include Fleming James, Frederich Kessler, William Prosser, Benjamin Cardozo and Roger Traynor. Clutterbuck, *Karl Llewellyn and the Intellectual Foundations of Enterprise Liability Theory,* 97 Yale L.J. 1131 (1988); Priest, *The Invention of Enterprise Liability, A Critical History of the Intellectual Foundations of Modern Tort Law,* 14 J. Legal Stud. 461 (1985). Priest had this to say about the modern theory of strict liability:

> In my view, the customs of modern tort law reflect a single coherent conception of the best method to control the sources of product related injuries. This conception which its

proponents called the theory of enterprise liability provide in its simplest form that business enterprises ought to be responsible for losses resulting from products they introduce into commerce. The theory incorporates views of the relationship between product manufacturers and consumers, of the role of consumers in preventing losses, of the role of internalizing costs to affect accident levels, of the most effective methods of distributing the risks of the losses that remain. Starting in 1930, this theory was developed and refined in twenty-five years of discussion within the academic literature.

Priest, *supra,* at 464–65.

(1989), the defective product was a pressure cooker, and the broker claimed that since he was not the manufacturer he bore no responsibility to the plaintiff. To this argument the court said:

> As far as we can tell, the parties do not dispute the fact that *Diaz was a broker or "sales representative," a middleman in the distribution chain.* Although Puerto Rico has not adopted the whole common law of torts, *Valle v. American International Insurance Co.,* 108 D.P.R. 735 (1979), it has chosen to adopt the principles of strict liability laid out in Restatement (Second) of Torts § 402A (1965). *Montero Saldana v. American Motors Corp.,* 107 D.P.R. 501 (1978); *Mendoza v. Cerveceria Corona, Inc.,* 97 P.R.R. 487, 499 (1969). And, courts following that section have routinely found "sales representatives" strictly liable for distributing defectively manufactured products. *See, e.g., Little v. Maxam, Inc.,* 310 F.Supp. 875 (S.D.Ill.1970); *Barth v. B.F. Goodrich Tire Co.,* 265 Cal.App.2d 228, 71 Cal.Rptr. 306 (Cal.Ct. App.1968); *Kirby v. Rouselle Corp.,* 108 Misc.2d 291, 437 N.Y.S.2d 512 (N.Y.Sup. Ct.1981); *Zamora v. Mobil Corp.,* 104 Wash.2d 199, 704 P.2d 584 (Wash.1985).

*Id.* at 34 (emphasis supplied).

Brokers—those who are more than mere negotiators between the parties never acting in their own names—are part of the chain of distribution as much as sellers or manufacturers. The strict liability test deals with the fact of marketing a defective product, not with the means of marketing. If, as in *Hoffman v. Loos & Dilworth,* 307 Pa.Super. 131, 452 A.2d 1349 (1982), the

participation in the marketing process is more than merely tangential, the participant must share in the loss that the defective product causes.[8] *See also Weber v. Johns–Manville Corp.,* 630 F.Supp. 285 (D.N.J.1986).

The facts here show that Associated Merchandising Corp. was an agent of the purchaser of the product (Dillards) from the manufacturer, *and* Associated arranged for the transportation of the defective product to Dillards, who sold it to the plaintiff. This conduct can certainly be reasonably construed as active and substantial participation in the distribution chain.

In my mind, Arizona courts have clearly spoken. Those who are organized to place a defective consumer product in the chain of distribution may be strictly liable to a consumer who is injured by that defective product. And a participant who is sued as a member of the distribution process is just as entitled as the plaintiff-consumer to join all legitimate defendant members in that process. In this case, AMC participated in the process of placing the defective luggage into the distribution chain. Title, control or money are irrelevant.

Therefore, I would reverse the trial court and remand for further proceedings.

---

**8.** Certainly entities who are slightly connected with the marketing process should not and are not held accountable. *See* Annotation, *When is* *a person "engaged in the business" for purposes of Doctrine of Strict Tort Liability,* 99 A.L.R.3d 671 (1980).