IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| VERONICA ANTONE, a single woman, individually and on behalf of her minor daughter, Mia Salcido; VERNON ANTONE, a single man, individually and on behalf of his minor son, Mingo Antone; and AMELIA ANTONE, a single woman, | ) ) ) ) ) ) ) ) | 2 CA-CV 2006-0180 DEPARTMENT A O P I N I O N |
| Plaintiffs/Appellants, | ) ) | |
| v. | ) ) | |
| GREATER ARIZONA AUTO AUCTION, INC., an Arizona corporation, | ) ) ) | |
| Defendant/Appellee. | ) ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20044760

Honorable Deborah Bernini, Judge

AFFIRMED

Gallagher & Kennedy, P.A.
  By Patrick J. McGroder III, Robert W. Boatman,
    and Shannon L. Clark                                                    Phoenix
                                      Attorneys for Plaintiffs/Appellants

Thomas, Thomas & Markson, P.C.
  By Benjamin C. Thomas and Michael A. Rossi                               Phoenix
                                      Attorneys for Defendant/Appellee

V Á S Q U E Z, Judge.

**¶1**        Appellants, Veronica Antone, Vernon Antone, and Amelia Antone, individually and in their representative capacities, appeal from the trial court's grant of summary judgment in favor of appellee, Greater Arizona Auto Auction ("GAAA") on their product liability claim. The sole issue raised in this appeal is whether a commercial car auctioneer is a "seller" within the meaning of A.R.S. § 12-681(9) and is therefore subject to strict liability under Arizona law.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**        Because this appeal arises from a trial court's grant of summary judgment, we view the facts and inferences therefrom in the light most favorable to the party opposing summary judgment. *See Andrews v. Blake*, 205 Ariz. 236, ¶ 12, 69 P.3d 7, 11 (2003). In November 1999, a used 1991 Ford F-150 pickup truck was traded into Jim Click Ford in Green Valley. The truck had had a number of prior owners when Jim Click Ford took title to it, and a trailer hitch had been welded to the rear bumper by a previous owner. Jim Click Ford took the truck to be auctioned through GAAA.

**¶3**        GAAA is an automobile auction facility. It auctions vehicles brought to it by licensed motor vehicle dealers to other dealers for a fee, in this case, $90. Its fees are not dependent upon the vehicle's condition and are only collected if the vehicle is sold. The buyer also pays a fee, in this case, $85. These fees pay for the costs of business, such as employees' salaries, the processing of vehicle titles, and the preparation of vehicles for sale. Buyers are able to view and inspect the vehicles prior to the auction. Apparently, vehicles are brought to GAAA no more than a few days in advance of the auction. GAAA had

2

possession of the truck in this case for one to two days before the auction. GAAA offers inspections for a fee, but it does not conduct them unless specifically requested to do so.

¶4 Truck Stop, Inc. was the successful bidder on the truck in this case. The truck was sold under a "red light" on an "as-is" basis. According to GAAA policies provided to bidders, this means there were no representations or warranties concerning the safety or condition of the truck.

¶5 Truck Stop sold the truck to Vernon and Brenda Antone in January 2000. On July 29, 2003, Vernon Antone, his son Mingo, Veronica Antone, her daughter Mia Salcido, and Amelia Antone were involved in a motor vehicle accident. Another car rear-ended Vernon's pickup truck, which caused the trailer hitch that apparently had not been properly installed to puncture the truck's fuel tank. The fuel tank ignited, and the family suffered burns and other injuries while trying to escape from the truck. On August 30, 2004, the Antones filed this personal injury action against Jim Click Ford, GAAA, and Truck Stop. In their complaint, the Antones alleged both strict product liability and negligence claims against all of the defendants for personal injuries resulting from the improperly installed trailer hitch. The claims against Jim Click Ford and Truck Stop were eventually dismissed with prejudice, apparently because they had entered into settlement agreements with the Antones.

¶6        GAAA then filed a motion for partial summary judgment on the Antones' strict liability claim,[1] and the Antones responded with a cross-motion for partial summary judgment.  After a hearing, the trial court granted GAAA's motion and entered a judgment after the claims against all other defendants had been resolved.  On appeal, the Antones assert that the trial court erred in granting GAAA's motion for partial summary judgment.

## STANDARD OF REVIEW

¶7        We review a trial court's grant of summary judgment de novo.  *Salib v. City of Mesa*, 212 Ariz. 446, ¶ 4, 133 P.3d 756, 760 (App. 2006).  Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Ariz R. Civ. P. 56(c), 16 A.R.S., Pt. 2.  Additionally, we are not bound by a trial court's interpretation of a statute.  *Romley v. Arpaio*, 202 Ariz. 47, ¶ 12, 40 P.3d 831, 835 (App. 2002).

## DISCUSSION

¶8        The Antones raise only one issue in this appeal: whether GAAA is a seller under Arizona's product liability statutes and is therefore subject to strict liability if it sells a defective and unreasonably dangerous product.  A "[s]eller" is defined as "a person or entity, including a wholesaler, distributor, retailer or lessor, that is engaged in the business of leasing any product or selling any product for resale, use or consumption."  § 12-681(9).

¶9        The trial court ruled that GAAA was not a seller under § 12-681(9) after finding that "GAAA's sole contact with the vehicle was to conduct the sale" and that GAAA

---

[1]The parties stipulated to dismiss the negligence claim with prejudice.

4

charged a flat fee, never took ownership or title of the vehicle in its name, and "conspicuously" designated the sale "as-is" with no warranty as to quality. The trial court likened GAAA's role in the sales transaction to the auctioneer in *Tauber-Arons Auctioneers Co. v. Superior Court*, 161 Cal. Rptr. 789 (Ct. App. 1980), and the product broker in *Dillard Department Stores, Inc. v. Associated Merchandising Corp.*, 162 Ariz. 294, 782 P.2d 1187 (App. 1989), and noted that strict liability policies are not satisfied when the entity only plays a "passive role in contributing to the product's presence in the stream of commerce." The court concluded "GAAA did not possess the requisite indicia to be classified a 'seller' as contemplated by A.R.S. § 12-681." For the reasons stated below, we agree.

¶10      In Arizona, "[s]trict liability is a public policy device to spread the risk from one to whom a defective product may be a catastrophe . . . to those who marketed the product, profit from its sale, and have the know-how to remove its defects before placing it in the chain of distribution." *Tucson Indus., Inc. v. Schwartz*, 108 Ariz. 464, 467-68, 501 P.2d 936, 939-40 (1972).[2] As this broad policy statement suggests, the underlying justification for imposing strict liability is risk/cost spreading to those parties in the distribution chain that are best able to both bear the cost and protect the consumer from

[2]We acknowledge that *Tucson Industries* and other cases we refer to in this decision were decided before the enactment of A.R.S. title 12, chapter 6, article 9 in 1978. However, A.R.S. § 12-682 provides: "The previously existing common law of products liability is modified only to the extent specifically stated in this article and [the statute of limitations in A.R.S.] § 12-551." Therefore, because these cases do not conflict with article 9 or § 12-551, they remain good law.

defective products. *Id.; Caruth v. Mariani*, 11 Ariz. App. 188, 191-92, 463 P.2d 83, 86-87 (1970). This policy was intended to protect consumers and encourage the safe design and manufacture of products. *See* Restatement (Second) of Torts § 402A cmt. c (1965).

¶11        The types of parties who may be held strictly liable are limited. These limits ensure that strict liability is not extended beyond those entities who are causally linked to the defective product by having placed it into the stream of commerce. *Winsor v. Glasswerks PHX, L.L.C.*, 204 Ariz. 303, ¶¶ 28-30, 63 P.3d 1040, 1048-49 (App. 2003). Thus, even though liability is imposed without regard to fault, liability will not be imposed on an entity that "bear[s] no causal connection to the production or distribution of the product." *Id.* ¶ 30. For this reason, A.R.S. § 12-681(5) and Restatement § 402A[3] limit the application of strict liability to product manufacturers and sellers for damages resulting from defective and unreasonably dangerous products they sell. *See O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 559-60, 447 P.2d 248, 251-52 (1968) (applying Restatement § 402A to facts

---

[3]Restatement (Second) of Torts § 402A (1965) provides, in pertinent part:

    (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

        (a) the seller is engaged in the business of selling such a product, and

        (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

of case); *Bailey v. Montgomery Ward & Co.*, 6 Ariz. App. 213, 216-17, 431 P.2d 108, 111-12 (1967) (adopting Restatement § 402A's strict liability rule in Arizona).

**¶12** Therefore, because GAAA is not a manufacturer, it can be held strictly liable only if it is a "seller" under § 12-681(9). *See* § 12-681(5). Our courts have avoided a "precise definitional usage" of the term "seller." *Unique Equip. Co. v. TRW Vehicle Safety Sys., Inc.*, 197 Ariz. 50, ¶ 24, 3 P.3d 970, 976 (App. 1999). Rather, "seller" has been defined in accordance with the policies underlying strict liability, *see, e.g., Tucson Industries*, 108 Ariz. at 466-68, 501 P.2d at 938-40, and has been expanded to include "a variety of enterprises that do not fit a common notion of . . . seller." *Unique Equip.*, 197 Ariz. 50, ¶ 24, 3 P.3d at 976; *see, e.g., Torres v. Goodyear Tire & Rubber Co.*, 163 Ariz. 88, 96, 786 P.2d 939, 947 (1990) (trademark licensors); *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.*, 135 Ariz. 309, 315, 660 P.2d 1236, 1242 (App. 1983) (used goods dealers); and *Gaston v. Hunter*, 121 Ariz. 33, 45-46, 588 P.2d 326, 338-39 (App. 1978) (pharmaceutical product donors). However, strict liability has been held not to apply to product brokers, *Dillard*, 162 Ariz. at 298-99, 782 P.2d at 1191-92, and automobile salvage yard operators, *Rix v. Reeves*, 23 Ariz. App. 243, 245, 532 P.2d 185, 187 (1975).

**¶13** Arizona has not yet determined whether a commercial auctioneer such as GAAA qualifies as a seller under § 12-681(9). It is not a "wholesaler, distributor, retailer or lessor" in the ordinary use of these terms, but as the cases indicate, "seller" has been interpreted expansively when it serves the policies underlying strict liability. *See, e.g., Jordan*, 135 Ariz. at 315, 660 P.2d at 1242.

7

¶14     The Antones rely on *Torres* for the proposition that this court can properly classify GAAA as a seller despite the fact that it labels itself an auctioneer. In *Torres*, our supreme court extended liability to a "trademark licensor for injuries caused by defects in a product produced and distributed by its licensee." 163 Ariz. at 88, 96, 786 P.2d at 939, 947. The court did so even though the licensor's "participation in research, design, manufacture, distribution, and sale was technically accomplished through its wholly owned subsidiaries." *Id.* at 94, 786 P.2d at 945. In deciding as it did, the court stated that "the application of strict liability does not hinge on the technical limitations of the term seller or manufacturer." *Id.* at 92, 786 P.2d at 943. The Antones assert this supports their argument that strict liability applies to anyone in the chain of distribution of defective, unreasonably dangerous goods under the risk/cost policy objectives of Arizona law.

¶15     Although this may be a correct general statement of the law, the record in this case does not support the Antones' claim that GAAA participates in the chain of distribution for strict product liability purposes in the same manner or to the same extent as the licensor in *Torres*. There, the court limited its extension of strict liability to "trademark licensors who significantly participate in the overall process by which the product reaches its consumers, and who have the right to control the incidents of manufacture or distribution." *Id*. at 95-96, 786 P.2d at 946-47. Other cases have similarly required participation in the chain of production and distribution before liability will apply despite the fact the putative seller was better situated to bear the risks and costs. *See, e.g., Dillard*, 162 Ariz. at 298, 782 P.2d at 1191; *Tauber-Arons*, 161 Cal. Rptr. at 796-98.

¶16 The Antones nonetheless contend GAAA is a seller because it has sufficient participatory connections with the vehicles it auctions to support the imposition of strict liability for damages suffered by the ultimate consumers of defective vehicles. The Antones make two arguments in support of this position. They suggest the correct analysis for this case is found in *Jordan* and the trial court's ruling is erroneous because it incorrectly relied on *Dillard* and *Tauber-Arons*.

¶17 The Antones argue that *Jordan* controls this case because the same policy considerations that led the court there to hold that used product sellers may be held strictly liable are also present in this case. Particularly, they focus on GAAA's ability to inspect vehicles and point out it is part of one of the largest auction companies in the country, profits from sales transactions, and has indemnity agreements and liability insurance. The Antones therefore contend GAAA should bear the cost and the risk in this case. We find the Antones' reliance on *Jordan* misplaced.

¶18 The main issue in *Jordan* was whether used product dealers may be held strictly liable for selling defective and unreasonably dangerous used products. 135 Ariz. at 309, 660 P.2d at 1236. The court in *Jordan* held they could. *Id*. In that case, the plaintiff's property was destroyed by an explosion caused by a used propane tank his father had purchased from a new and used propane tank dealer. *Id*. at 310, 660 P.2d at 1237. After surveying case law from Arizona and other jurisdictions, Division One of this court concluded that used products dealers could be subject to strict liability. *Id*. at 311-15, 660 P.2d at 1238-42. The court examined the policy considerations the Antones discuss and concluded:

9

> It is enough that [the seller] is anywhere in the chain of supplying goods to the public, that he is in the business of supplying the goods and that the item reaches the consumer without substantial change in its condition. There is no justification for finding that used good dealers as a class cannot shift losses, distribute costs, or insure against losses.

*Id*. at 315, 660 P.2d at 1242.

¶19 The policy considerations mentioned in *Jordan* suggest why the court concluded it was inappropriate to summarily exclude used product sellers from ever being held strictly liable. However, as GAAA correctly notes, *Jordan* does not stand for the proposition that anyone connected with the sale of used products is strictly liable. And it does not suggest that insurance coverage and financial ability to pay for losses are the determining factors in imposing strict product liability. It is difficult to conceive of a case where the consumer would ever be best able to bear both the cost and the risk associated with a defective product.

¶20 Furthermore, *Jordan* is factually distinguishable from this case and does not require the extension of strict liability to GAAA. *See id.* at 311, 660 P.2d at 1238 (framing issue as "whether or in what circumstances a dealer in used products should be held strictly liable for a defect attributable to the initial design or manufacturing of the used product"). The seller in *Jordan* sold the product to the ultimate consumer, owned the product it sold, and apparently sold only the specific type of product that injured the plaintiff's property, *id*. at 310, 660 P.2d at 1237, whereas GAAA never interacted with an ultimate consumer and at no time took title to or sold any vehicle. Thus, in *Jordan*, the seller's participation

10

in placing the item into the stream of commerce was more substantial than GAAA's. *See Torres*, 163 Ariz. at 95-96, 786 P.2d at 946-47.

¶21 Similarly, we find no merit to the Antones' second argument that the trial court's reliance on *Tauber-Arons* and *Dillard* was inappropriate. The Antones attempt to distinguish this case from *Tauber-Arons* and *Dillard*, arguing GAAA has more substantial "participatory connections" with the products it auctions.

¶22 In *Tauber-Arons*, an employee of the purchaser of a used wood planer brought a strict product liability action against an auctioneer for injuries sustained from the allegedly defective planer. 161 Cal. Rptr. at 790. A manufacturing company that was going out of business paid the auctioneer a $2,500 flat fee to auction the manufacturing company's factory equipment. *Id*. The auctioneer advertised the auction and cleaned the equipment but did not perform any repairs or maintenance on it. *Id*. at 790-91. The auctioneer never took title to the equipment and sold it "as-is." *Id*. at 791. The plaintiff's employer purchased the planer at the auction, and the plaintiff was subsequently injured while using the planer in the course of his employment. *Id*. at 790. The trial court ruled the auctioneer was strictly liable because it was "'in the chain of commercial marketing,'" and the auctioneer challenged its order. *Id*. at 791.

¶23 The appellate court reversed, finding that mere agency was not determinative of strict liability. *Id*. at 793. Rather, the court focused on the requirement that a "defendant have a participatory connection with the enterprise which 'created consumer demand for and reliance upon' the particular 'injury-producing product,' not just products of the same classification." *Id., quoting Kasel v. Remington Arms Co.*, 101 Cal. Rptr. 314, 323 (Ct.

11

App. 1972) (citation omitted). It examined both the manufacturer's and the auctioneer's connection with the particular product and concluded that "the only connection between [the auctioneer] and [the manufacturer's] products [wa]s its 'random and accidental role' in transferring the planer from one consumer to another." *Id*. at 794, *quoting Garcia v. Halsett*, 82 Cal. Rptr. 420, 423 (Ct. App. 1970) (citation omitted).

¶24 Likewise, in *Dillard*, Division One of this court held that a product broker was not a seller for strict liability purposes. 162 Ariz. at 298-99, 782 P.2d at 1191-92. A consumer was injured by an allegedly defective suitcase he purchased at a department store. *Id*. at 295, 782 P.2d at 1188. The store had purchased the suitcase from a manufacturer it had been put in touch with by the product broker. *Id*. at 296, 782 P.2d at 1189. The broker provided "buying services and merchandise management" to its member stores. *Id*. at 295, 782 P.2d at 1188. Apparently, the broker put member stores in touch with various manufacturers "as potential sources of products the stores wish[ed] to retail." *Id*. at 295-96, 782 P.2d at 1188-89. It did not take title to, sell, or exercise control over any of the merchandise. *Id.* The merchandise was purchased directly by member stores from manufacturers and never passed through the broker's hands. *Id*.

¶25 The department store argued that strict liability should be imposed on the broker because it was "in the chain of distribution of a defective product reaching and injuring the consumer." *Id*. at 296, 782 P.2d at 1189. Division One, relying in part on the test laid out in *Tauber-Arons*, found the broker's participatory connections inadequate to establish liability, saying:

12

> [The broker] had neither ownership nor possession of the [defective product] nor the opportunity to inspect, examine, or otherwise exercise control over it. [The broker] essentially provides a service to retailers, rather than specific goods to the public. [It] did not make a commission, profit, or otherwise directly benefit from the specific transaction resulting in [the] purchase of the [product]. . . . [Its] role in that transaction hardly created any consumer reliance as to the type of product or its quality.

*Id*. at 297-98, 782 P.2d at 1190-91. The court also stated that strict liability should only be imposed on "those defendants who satisfy the policy consideration giving rise to the doctrine" and noted that "[m]erely pointing to an entity which is in the 'stream of commerce' or part of the 'enterprise' is not enough." *Id*. at 298, 782 P.2d at 1191. Ultimately, it held "the dual concepts of profitable venture and preventive action do not apply." *Id*.

¶26 Comparing GAAA's participatory connections with the injury-producing product to those of the auctioneer in *Tauber-Arons* and the product broker in *Dillard*, we fail to find any meaningful distinctions. Like those defendants, GAAA provides a service to parties in the direct chain of commerce. It charges fees to buyers and sellers who successfully use its services, but those fees are not dependent on the vehicle's specific condition or the vehicle's selling price. In a large part, the fees pay GAAA's operating costs; they are not pure profit from the sales.

¶27 Although sellers may leave vehicles at the auction lot before the day of the auction, GAAA never takes ownership or title to the vehicles and does not inspect them for quality unless specifically asked. And the auctioned vehicles are expressly sold "as-is" with no representations or warranties as to their condition or safety. Therefore, GAAA does not

exercise such a degree of control over the vehicles that it can be said to foster consumer reliance as to their quality. *See id*.

¶28 Furthermore, GAAA's day-to-day contacts are with used vehicles generally, not specifically with Ford F-150 trucks of the type Antone purchased. GAAA has no special relationship with Ford or any other manufacturer that would allow it to influence the design and manufacture of safer vehicles. It does not have continuing service contracts with buyers and sellers; rather, it auctions the vehicles brought to it on an ad hoc basis. Thus, it cannot be said that GAAA has a participatory connection with the injury-producing product rather than general products of the same classification. *See Tauber-Arons*, 161 Cal. Rptr. at 793.

¶29 The Antones also rely on *Musser v. Vilsmeier Auction Co.*, 562 A.2d 279 (Pa. 1989), to suggest that GAAA should be subject to strict liability. In *Musser*, a farm machinery company had contracted with an auction company to auction its used equipment. *Id*. at 279. The auction company advertised the auction and never took ownership of or controlled the equipment. *Id*. at 279-80. All items sold through the auction were sold "as-is" and "where-is" and had no guarantees. *Id*. at 280. The plaintiff's father purchased a tractor at the auction, which later injured the plaintiff. *Id*. The son sought to hold the auction company strictly liable for his injuries. *Id*.

¶30 The Pennsylvania Supreme Court refused to hold the auction company strictly liable on these facts. *Id*. at 283. It characterized the company as "an *ad hoc* salesman of the goods of another for a specific purpose and a specific time" and noted that the consumer protection policies underlying strict liability were not served when an auctioneer "is only a salesman or agent for a given time and place . . . [because] he can bear no relationship to

14

the dealer or manufacturer sufficient to . . . protect[] the buyer from defective manufacture." *Id*. at 283. However, the court did recognize that calling oneself an auctioneer would only be a "euphemism" for seller if the auctioneer "specializes in the product of a single manufacturer or specific manufactured good." *Id*.

¶31    The Antones argue that *Musser* supports an imposition of strict liability in this case because GAAA specializes in the "specific manufactured good" of used vehicles. *Id*. They rely on the court's statement in *Musser* that, "[u]nless an auctioneer deals exclusively for a manufacturer or business enterprise, or buys and deals regularly in his product, he is the medium and the message but not a regular seller" in arguing that GAAA deals regularly in used vehicles. *Id*. However, this language does not support the Antones' argument or the imposition of strict liability in this case.

¶32    First, used vehicles generally are a broad class of manufactured goods and are not a "specific manufactured good." *Id*. Second, GAAA does not deal exclusively with Ford or Jim Click Ford, and it does not "buy[] and deal[]" in any particular type of vehicle, let alone a specific make or model. *Id*. GAAA accepts vehicles for auction from any licensed motor vehicle dealer who has been approved to do business, but it never takes title or ownership of any of the vehicles it auctions. Therefore, we do not find that the policy considerations the Antones extrapolate from *Musser* provide us a basis to impose strict liability in this case.

¶33    At its essence, GAAA provides the service of facilitating sales transactions of used vehicles between commercial buyers and sellers. It has no ongoing relationship with any entity in the chain of distribution, particularly those entities with the ability to make

15

products safer. There is simply no evidence GAAA "significantly participate[s] in the overall process by which the product reaches . . . consumers" or "ha[s] the right to control the incidents of manufacture or distribution." *Torres*, 163 Ariz. at 95-96, 786 P.2d at 946-47. In the absence of a more direct causal link between the injury-producing product and GAAA's role in the product's distribution, strict liability is simply not an appropriate theory of liability. *See Winsor v. Glasswerks PHX, L.L.C.*, 204 Ariz. 303, ¶¶ 28-30, 63 P.3d 1040, 1048-49 (App. 2003). Accordingly, we conclude that GAAA is not a seller for purposes of § 12-681(9).

**¶34** As a final note, GAAA urges this court to consider and adopt the Restatement (Third) of Torts: Products Liability § 20 (1998).[4] In the proceedings below, the trial court found Restatement § 20 expressly excludes strict liability for commercial auctioneers and only imposes strict liability on parties with ownership interests. However, we do not address this argument because the trial court's ruling and our resolution of the case rest on settled principles of Arizona law.

**¶35** For the foregoing reasons, we affirm the summary judgment.

_____
GARYE L. VÁSQUEZ, Judge

---

[4]Restatement § 20 defines those who sell or otherwise distribute products for the purposes of product liability. Comment g to § 20 states: "Persons assisting or providing services to product distributors, while indirectly facilitating the commercial distribution of products, are not subject to liability under the rules of this Restatement. Thus, . . . commercial auctioneers are . . . outside the rules of this Restatement."

CONCURRING:


_____
JOHN PELANDER, Chief Judge


_____
JOSEPH W. HOWARD, Presiding Judge