**Tammy HABERLE, Appellant,**

v.

**Henry BUCHWALD, M.D., Respondent,**

**Jerome A. Burns, M.D., Defendant,**

**Scott Gruber, M.D., et al., Respondents.**

**No. C9–91–1238.**

Court of Appeals of Minnesota.

Jan. 28, 1992.

---

Arlo H. Vande Vegte, Arlo H. Vande Vegte, P.A., Long Lake, Terence J. McCloskey, New Brighton, for appellant.

Kay Nord Hunt, Phillip A. Cole, Lommen, Nelson, Cole & Stageberg, Minneapolis, for Henry Buchwald, M.D.

Timothy R. Murphy, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, for Scott Gruber, M.D., et al.

Considered and decided by FORSBERG, P.J., and CRIPPEN and DAVIES, JJ.

## OPINION

FORSBERG, Judge.

Appellant Tammy Haberle brought this medical malpractice action against respondent Henry Buchwald, M.D.; respondents Scott Gruber, M.D., University of Minnesota Hospitals and Clinics, and University of Minnesota Clinical Associates Chartered; and defendant Jerome A. Burns, M.D., who was never served and has not been a party to this action.

Appellant's complaint alleges negligent care and treatment with respect to a stomach stapling procedure performed by respondents. Following completion of discovery, respondents brought motions for summary judgment, arguing appellant's action was barred by the two-year statute of limitations. Appellant opposed the motions, and moved to amend her complaint to include claims of failure to obtain her informed consent, fraudulent concealment, and more specific allegations of negligent care and treatment.

This appeal is from the judgment granting respondents' motions for summary judgment and dismissing appellant's claims with prejudice. Respondents Gruber and the University have since been dismissed by stipulation, and are no longer involved in this appeal. We affirm the grant of summary judgment to respondent Buchwald.

## FACTS

Appellant began treating at the University of Minnesota Family Practice Clinic in 1984 for chronic abdominal pain, obesity, and dietary problems. In the summer of 1985, she was diagnosed as suffering from gastritis and/or peptic ulcer disease. She was not advised of this diagnosis, and was treated with Ranitidine and antacids.

After a year of unsuccessful standard dieting measures, appellant was referred to respondent Buchwald at the University's Red Surgery Service. While Buchwald was not employed by the University, he performed virtually all of the "Roux-en-Y gastric by-pass" (also referred to as "GIB" or "stomach stapling") procedures at the University.

In November 1985, appellant was interviewed by Buchwald and a nurse employed by the University. Appellant's chart from the University Family Practice Clinic was not available at the interview, and a verbal history was taken. The notes taken during the interview fail to mention appellant's history of peptic ulcer disease.

On Buchwald's recommendation, appellant made arrangements to be admitted in January 1986 for GIB surgery. Her history of peptic ulcer disease was documented in a pre-operative history and in admission notes, but no diagnostic tests were conducted in that regard.

On January 13, Buchwald performed the GIB. The operative reports do not disclose any problems. During the procedure, the top portion of the stomach is stapled shut to create a smaller pouch through which food and liquids pass. The large lower portion of the stomach becomes inaccessible to normal diagnostic methods, and the only way to examine any pathology which may be occurring inside the lower portion is to open it up surgically.

Within days, appellant began experiencing severe complications. While a leak of gastro-intestinal fluids was suspected, no leak could be demonstrated by x-ray. However, by January 16, appellant had entered a downward, progressive spiral of hypovolemic shock.

Early on January 17, Buchwald performed emergency exploratory surgery. On visual examination, Buchwald discover-

ed what he described as a "bruise" on the posterior of the lower pouch of appellant's stomach. He elected to "imbricate the gastric pouch," which was accomplished by tucking the bruised area underneath an area of nearby uncompromised stomach tissue and an area of nearby tissue from the small intestine. By injecting dye, Buchwald concluded there were no leaks either in the surgical connections or in the lower pouch. He did not open the lower pouch to look inside.

On January 21, four days after this first exploratory emergency surgery, appellant again fell into severe hypovolemic shock. A second emergency exploratory surgery was performed by Robert Goodale, M.D. Upon removing the stitches from the area oversewn by Buchwald on January 17, Goodale discovered that the underlying area was necrotic and perforated. After an endoscopic examination, Goodale further determined the posterior of the upper pouch was also necrotic. Under these circumstances, Goodale had no choice but to remove 80% of appellant's stomach. Goodale also had to disconnect appellant's esophagus from her bowel, place a tube in her neck to drain her esophagus, and place a feeding tube in her abdomen.

Appellant claims that when she asked Buchwald to explain the reason for her complications, he denied knowledge of any cause. In a letter dated March 24, 1986, Buchwald stated it was "impossible to ascertain why gastric necrosis had taken place." He did, however, suggest that the necrosis may have been caused by the failure of the nasal gastric suctioning system to properly operate following the January 13 procedure.

Appellant continued to treat with Buchwald until late 1988 or early 1989, when this action was commenced. In an affidavit, appellant's expert witness concluded the following acts were negligent:

1. failure to obtain appellant's medical chart during her initial interview with Buchwald in November 1985;

2. failure to perform additional pre-surgical diagnostic workup to document the status of appellant's peptic ulcer disease;

3. failure to obtain appellant's informed consent;

4. allowing an embarrassment of the stomach's blood supply during the January 13 surgery; and

5. treatment of the "bruise" during the January 17 surgery.

It is undisputed that these claims of negligence relate solely to the period prior to her January 13 surgery, and to the January 13 and January 17 surgeries themselves. Appellant does not allege any negligence occurred during the January 21 surgery or during the post-operative period when she was still being treated by Buchwald.

## ISSUES

1. Did the trial court err in determining the "single act exception" applies and bars this action?

2. Did the trial court err in concluding no evidence was produced to show fraudulent concealment?

## ANALYSIS

On appeal from a grant of summary judgment, this court's role is to determine whether there are any genuine issues of material fact or whether the trial court erred in its application of the law. *Offerdahl v. Univ. of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). For the purposes of this appeal, the facts will be viewed in a light most favorable to appellant, the party against whom summary judgment was granted. *See Peterson v. St. Cloud Hosp.*, 460 N.W.2d 635, 638 (Minn.App.1990).

### I.

Medical malpractice actions in Minnesota must be commenced within two years after the cause of action accrues. Minn.Stat. §§ 541.01 and 541.07(1) (1988). Accrual of the cause of action in such cases generally does not occur until the treatment ceases. *Schmitt v. Esser*, 178 Minn. 82, 86, 226 N.W. 196, 197 (1929).

A "practical reason" for this termination of treatment rule is that "actionable treat-

ment does not ordinarily consist of a single act or, even if it does, it is most difficult to determine the precise time of its occurrence." *Swang v. Hauser*, 288 Minn. 306, 309, 180 N.W.2d 187, 189 (1970). This rule is also based on a "policy reason" that,

> the patient must repose reliance upon his physician in the completion of the course of curative treatment, a relationship of trust which inhibits the patient's ability to discover acts of omission or commission constituting malpractice. The physician must accordingly assume a most substantial burden to establish with certainty that his patient actually knew, or should have known, of the malpractice prior to the end of treatment.

*Id.*

■ In cases where these concerns are not present, the two-year statute of limitations begins to run at the time of the negligent act, and not at the termination of treatment. *See Schmitt*, 178 Minn. at 84, 226 N.W. at 197 ("It is true that if there be but a single act of malpractice subsequent time and effort merely to remedy or cure that act could not toll the running of the statute."). The following four elements must be met before this single act exception applies: there must be a single act of negligence, which is complete at a precise time, which no continued course of treatment can either cure or relieve, and the plaintiff must be actually aware of the facts upon which the claim is based. *Crenshaw v. St. Paul Ramsey Medical Ctr.*, 379 N.W.2d 720, 721 (Minn.App.1986), *pet. for rev. denied* (Minn. Mar. 27, 1986).

1. "A single act of malpractice."

■ Appellant's claims of negligence include failure to read her chart in November 1985, failure to obtain gastric hemostasis during the first surgery on January 13, 1986, performing a contraindicated imbrication during the first emergency exploratory operation on January 17, and failure to obtain her informed consent. Appellant argues the single act exception does not apply because her case involves multiple acts of negligence occurring at different times and for different purposes. She asserts the two surgeries of January 13 and January 17 were for entirely different reasons, and involved different standards of care and levels of causation. She further asserts it took sophisticated expert knowledge to sort out how and when each act of negligence occurred, and to determine the chain of causation.

In *Gulley v. Mayo Found.*, 886 F.2d 161, 163 (8th Cir.1989), the single act exception was held to apply even though Gulley's complaint alleged multiple acts of negligence in connection with a thoracotomy, including recommending surgery, failing to get informed consent, and performing the surgery. Following the thoracotomy in January 1985, Gulley developed shortness of breath. He returned to the Mayo Clinic for examinations and recommendations in May 1985 and again in May 1986, when the course of treatment terminated. *Id.* at 162. In holding Gulley's suit barred under the single act exception, the Eighth Circuit emphasized that despite Gulley's subsequent visits to Mayo, "all alleged malpractice * * * occurred at or prior to the performance of the January 16, 1985 surgery." *Id.* at 163.

As in *Gulley*, the key in this case is that all the alleged acts of negligence occurred prior to an identifiable point in time, the January 21 surgery. The practical reason behind the termination of treatment rule therefore is not a concern here, and this case is distinguishable from one in which an entire course of treatment is alleged to be negligent, or where a single act or acts of negligence cannot be readily identified.

Appellant nevertheless emphasizes that the first exploratory surgery on January 17 was in the nature of follow-up care, and that the course of treatment was therefore continuing. She asserts that the purposes of the January 13 and January 17 surgeries were entirely different: the original was to cure obesity, while the first exploratory was diagnostic and life preserving. However, the acts of negligence are still readily identifiable, and application of the two-year statute of limitations to either date would bar this action.

2. "Which is complete at a precise time."

As already discussed, all acts of negligence were complete by January 21, 1986.

3. "Which no continued course of treatment can either cure or relieve."

This element has been met because when appellant's stomach was removed on January 21, all of the follow-up care, additional admissions and additional surgeries could not change the fact that most of appellant's stomach had been removed. *See Schmitt,* 178 Minn. at 84, 226 N.W. at 197 ("[I]f there be but a single act of malpractice, subsequent time and effort to merely remedy or cure that act could not toll the running of the statute."). All subsequent treatment was independent of the alleged malpractice and in no way had the effect of concealing any prior defective treatment nor any injury arising from it.

4. "Where the plaintiff is actually aware of the facts upon which the claim is based."

Appellant asserts the trial court placed the entire burden of knowledge on her because she was aware or should have been aware of her injury on January 21, when she lost her stomach. *See Swang,* 288 Minn. at 309, 180 N.W.2d at 190 (because relationship of trust exists between physician and patient "which inhibits the patient's ability to discover acts of omission or commission constituting malpractice," physician assumes "a most substantial burden to establish with certainty that his patient actually knew, or should have known, of the malpractice prior to the end of treatment"). Appellant contends the trial court's ruling ignores the obscurity created by the multiplicity of negligent acts and by the continuing physician/patient relationship. She further insists Buchwald's denial of malpractice contributed heavily to this obscurity.

■ Ignorance of a cause of action not involving continuing negligence or fraud does not toll accrual of a cause of action. *See Dalton v. Dow Chem. Co.,* 280 Minn. 147, 153, 158 N.W.2d 580, 584 (1968). When determining whether a plaintiff was "actually aware" of the facts upon which a claim is based, the question is whether the plaintiff actually knew or should have

known. *See Offerdahl,* 426 N.W.2d at 429 (single act exception applies to bar claims against University for malpractice associated with insertion of IUD, notwithstanding continuing course of treatment, because plaintiff sustained damage and was aware of that damage as of the date the IUD was removed and she was hospitalized for chronic pelvic inflammatory disease).

■ Following the January 21 surgery, appellant either knew or should have known that there had been substantial and unforeseen complications. She had lost 80% of her stomach, and was being fed through a tube in her abdomen. From a common sense viewpoint, it is clear appellant knew or should have known the facts upon which her claim could be based as of January 21, 1986. Accrual of a cause of action need not wait until a plaintiff in fact has sought an expert opinion stating there was a departure from accepted medical practice. Acceptance of such a position would emasculate the single act exception.

■ In conclusion, we note that the phrase "a single act of malpractice" is a misleading title for the legal concept · it identifies. The rule applies, not to conduct that starts and ends in a moment, but rather to a course of malpractice which terminates at a specific point in time. In this instance, the alleged malpractice clearly ended on January 17, with the emergency exploratory operation. All subsequent treatment was independent of the alleged malpractice and in no way negligent. Following the January 21 surgery, appellant's injuries were obvious, and the facts upon which her claims are based were readily obtainable and discoverable at that point.

A literal interpretation of the "single act" requirement would mean the statute of limitations would never run for a physician who continued to provide treatment. A rule of law that would force a doctor to terminate treatment in order to have the benefit of the statute of limitations would be unfair, protecting all doctors except those who continue to provide care. It is unfortunate that this exception acquired the name "single act" when what was in-

tended is quite a different matter, termination of the episode of malpractice at an identifiable point in time.

We therefore affirm the trial court's determination that the single act exception applies, and bars appellant's claims against Buchwald.

## II.

A statute of limitations may be tolled if the cause of action is fraudulently concealed by the defendant. *See Schmucking v. Mayo*, 183 Minn. 37, 40–41, 235 N.W. 633, 634 (1931). To establish fraudulent concealment, a plaintiff must prove there was an affirmative act or statement which concealed a potential cause of action, that the statement was known to be false or was made in reckless disregard of its truth or falsity, and that the concealment could not have been discovered by reasonable diligence. *Collins v. Johnson*, 374 N.W.2d 536, 541 (Minn.App.1985), *pet. for rev. denied* (Minn. Nov. 26, 1985); *see also Goellner v. Butler*, 836 F.2d 426, 431–32 (8th Cir.1988) (court rejected argument that defendants had fraudulently concealed a cause of action because they made statements to the effect that the IUD was a safe contraceptive technique and that "these things happen").

The trial court in this case rejected appellant's claim of fraudulent concealment:

> Central to the concept of fraud is a knowing and intentional statement, act, or refusal to act where a duty to act lies. There is no evidence in the record to support a conclusion that any of the doctors involved in plaintiff's surgeries knew that their representations about the surgeries were false or were made in reckless disregard of their truth or falsity. Moreover, there is no evidence to support the argument that Dr. Buchwald's actions during the January 17, 1986, surgery were intended to conceal the results of the January 13, 1986 surgery. Plaintiff has failed to make out any case for fraudulent concealment.

(Citations omitted.)

Appellant insists a genuine fact issue exists as to whether there was fraudulent concealment based on Buchwald's false denial of the cause of her complications, and on the exclusion or misstatement of important information in her medical records. However, appellant has produced no facts suggesting Buchwald intentionally concealed anything from her or made statements in reckless disregard of the truth. While appellant's expert expressed opinions as to the cause of appellant's injuries and Buchwald's departures from accepted practice, he did not opine that Buchwald intentionally or fraudulently kept information from appellant regarding the cause of her complications. Nor has appellant shown Buchwald intentionally omitted important information from her medical records. Indeed, her expert witness' opinions of negligence are based on those records.

Appellant correctly notes that fraud may be proved by circumstantial evidence or "collateral facts." *Hollerman v. F.H. Peavey & Co.*, 269 Minn. 221, 230, 130 N.W.2d 534, 541 (1964). However, while appellant's expert witness may have been of the *opinion* that there was medical negligence, that opinion does not constitute circumstantial evidence of a fact that Buchwald knew he had been negligent and intentionally failed to disclose it.

Finally, we have considered the additional claims appellant sought to raise in her amended complaint and the more specific opinions of negligence contained in the supplemental affidavit of appellant's expert witness. Neither affects our decision here. We therefore conclude that the two-year statute of limitations began to run no later than January 21, 1986, and that appellant's claims against Buchwald are barred.

## DECISION

The trial court's grant of summary judgment to Buchwald is affirmed.

Affirmed.