36 F.Supp.2d 863 (1998)
In re MINNESOTA BREAST IMPLANT LITIGATION.
Hurby Felker, et al., Plaintiffs,
v.
McGhan Medical Corporation and Minnesota Mining and Manufacturing Company / 3M Company, Defendants.
No. Civ. 97-1497 PAM/JGL.
United States District Court, D. Minnesota.
November 13, 1998.
*864 *865 *866 *867 *868 *869 John W. Carey, Sieben Grose Von Holtum McCoy, Carey, Fairfax, MN, Robert J. Gordon, Paul J. Pennock, Perry Weitz, Denise M. Dunleavy, Sheila Beckman, Weitz & Luxenberg, New York City, for plaintiff.
Bridget M. Ahmann, Linda Susan Svitak, Joseph Michael Price, Bruce Gregory Jones, Faegre & Benson, Minneapolis, MN, Arvin Maskin, Konrad L Cailteux, Weil Gotshal & Manges, New York City, Peter Braun, for defendants.

MEMORANDUM AND ORDER
MAGNUSON, Chief Judge.
This matter is before the Court upon Defendant Minnesota Mining and Manufacturing Company's Motion for Summary Judgment against thirteen of the Plaintiffs. For the following reasons, Defendant's motion is granted.

BACKGROUND
The present case involves silicone breast implants manufactured by Defendant Minnesota Mining and Manufacturing Company ("3M") and Defendant McGhan Medical Corporation ("McGhan"). In 1997, several hundred silicone breast implant cases were *870 transferred to this Court by the Honorable Jack B. Weinstein of the Eastern District of New York. Included in the cases transferred were disputes involving implants manufactured and sold by McGhan after 3M sold its implant business to McGhan. These cases are the subject of the present motion.
Silicone breast implants were first marketed in the United States by Dow Corning Corporation. At that time, Donald McGhan was an engineer for Dow Corning. In 1974, Donald McGhan and some of his colleagues formed McGhan Medical Corporation ("McGhan I"), where they marketed their own line of breast implants. In 1977, 3M purchased McGhan I. Following the acquisition, 3M created a new wholly-owned subsidiary named McGhan Medical Corporation ("McGhan II").
Plaintiffs allege that 3M learned of many defects and risks associated with silicone implants prior to the purchase of McGhan I. At any rate, it is undisputed that during the time 3M manufactured and sold silicone breast implants, it became aware of risks associated with them. Specifically, patients experienced problems such as capsular contracture (formation of scar tissue through fibrosis), gel bleed (liquid silicone leaking outside of the intact shell of the implant), silent rupture (rupture which was not immediately detected), migration of leaked silicone away from the breasts, and inflammation. In 1984, 3M divested itself of the silicone breast implant product line, selling the business to a newly created McGhan entity, McGhan Medical Corporation ("McGhan III").
McGhan III purchased 3M's breast implant business for $5.5 million; $2.75 million of this purchase price was paid by promissory note, payable within three years of the closing. Although the breast implant business belonged solely to McGhan III following the sale, 3M continued to provide McGhan III with selected services for a short period of time. 3M also retained its leasehold on the property where the implants were manufactured; thus, in effect, 3M became McGhan III's landlord.
When 3M sold its breast implant business to McGhan III in 1984, it issued a press release, stating, "The business was sold because it was not consistent with the Division's future growth targets... We feel the new owners have the ability to continue 3M's strong quality orientation and service support to the business." (Dunleavy Aff.Ex. 60.) Then-existing 3M customers received a mailing notifying them of the sale to McGhan III. At this same time, an internal memorandum within 3M noted the pending Food and Drug Administration decision to reclassify the breast implant devices to Class 3 status and the number of lawsuits which impacted the profitability of the implant line. (See id. Ex. 45.)
In August 1985, one year after the sale to McGhan III, the $2.75 million in debt was restructured and extended by 3M. This restructuring was defaulted on by McGhan III in April 1987. 3M stayed enforcement of the promissory note, and again restructured the debt in April 1988. At this time, 3M received $1.405 million in cash, and restructured the remaining $1 million in principal. In December 1989, McGhan III paid $100,000 towards the principal, and 3M released the UCC filing on McGhan III, leaving McGhan III free to sell its business to INAMED, a publicly held corporation. Later, in March 1990, 3M loaned $300,000 to McGhan III to allow McGhan III to settle a breast implant products liability lawsuit.
3M now moves for summary judgment on claims raised by Arizona plaintiffs ("Plaintiffs") who purchased breast implants manufactured and sold by McGhan after the 1984 divestiture.[1] The Arizona Plaintiffs asserted their claims in the Master Complaint on file in In re: Silicone Breast Implant Products Liability Litigation (MDL-926), now pending in the United States District Court for the District of Alabama, before the Honorable Sam C. Pointer. The First Amended Master Complaint *871 contains the following causes of action: strict liability, negligence, failure to warn, breach of express and implied warranties, breach of warranty of fitness for a particular purpose, breach of Uniform Commercial Code or applicable state law, breach of Uniform Commercial Code or applicable state law/negligence per se, violation of the Food, Drug and Cosmetics Act/negligence per se, misrepresentation/fraud, fraud by concealment, violation of state consumer protection statutes, false advertising, violation of state consumer protection statutes/negligence per se, res ipsa loquitor, common plan to prevent public awareness of breast implant hazards, conspiracy/concert of action, market share liability, intentional infliction of emotional distress, negligent infliction of emotional distress, fear of future product failure, liability for participation in joint enterprises/joint ventures, control and/or supervision of joint ventures, invalidity of indemnification agreements, controlling person/aiderabettor/and/or alter ego liability, application of collateral estoppel/res judicata, violations of the Lanham Act, violations of the Magnuson-Moss Act, declaration that compensatory/punitive damages limitations violate federal/state constitutions, and punitive damages.
3M asserts that summary judgment is proper because 3M owed no duty to Plaintiffs who received implants manufactured and sold by McGhan III. Plaintiffs contend that 3M remains liable because it perpetrated a fraud on consumers when it sold the breast implant division to McGhan to avert liability. The Court now turns to addressing the issues raised in this motion.

DISCUSSION

A. Standard of Review
Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir.1992). The court determines materiality from the substantive law governing the claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. See id. A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. See id. at 248-49, 106 S.Ct. 2505.

B. Choice of Law
When a case is transferred pursuant to 28 U.S.C. § 1404(a), the transferee court must apply the law of the transferor court. See Ferens v. John Deere Co., 494 U.S. 516, 521-22, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). This principle also applies to choice of law decisions. See id. Accordingly, this Court must apply New York's choice of law rules. New York law provides that the law of the state having the "greatest interest in resolving the particular issue" governs. See Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 595 N.Y.S.2d 919, 612 N.E.2d 277, 280 (1993). Further, in determining which state has the greatest interest, the court is to focus on "`the parties' domiciles and the locus of the tort.'" AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992) (quoting Schultz v. Boy Scouts of Amer., Inc., 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684 (1985)).
3M asserts that Arizona law applies to the present motion because all of the Plaintiffs are from Arizona, the implant surgery for each took place in Arizona, and all of their alleged injuries were suffered in Arizona. In contrast, Plaintiffs contend that "Defendant's choice of law logic applies only to standard products liability issues vis-a-vis the injured Plaintiffs and the product, none of which are before this Court as the asserted basis for 3M's liability." (Mem. Opp'n at 21.) Instead, Plaintiffs now assert that the basis for their claims against 3M is 3M's alleged fraudulent divestiture of its breast implant division. Essentially, Plaintiffs argue that 3M perpetrated a fraud on all consumers nationwide when it failed to publicly admit that the sole reason for the divestiture of the breast implant division was to avert liability.
*872 Plaintiffs arguments do not change the fact that their physical injuries occurred in Arizona. Thus, with respect to Plaintiffs' claims which are rooted in products liability theory, i.e., claims relying on allegations that the breast implants were defective, Arizona law applies. However, Plaintiffs' claims of fraud are based upon 3M's actions at the time of the divestiture of the breast implant business. It is undisputed that 3M's actions regarding that transfer occurred in Minnesota; thus, Minnesota law shall apply to Plaintiffs' fraud claims.[2]

C. Claims Based on Theory that Breast Implants Were Defective
3M asserts that Plaintiffs' products liability claims require that 3M manufactured and sold the breast implants to the Plaintiffs. The following Plaintiffs received their implants after 3M divested itself of the breast implant business to McGhan III in 1984: Kathy Ann Dale, Peggy Lee Rubie, Susan A. Suftko, Nan Marie Swanson, Nancy Anne Wold, Sherry Beth Worden, Carrie Elizabeth Winter, Opelia S. Aparicio, Sylvana Anderson, Margie A. Brooks, Doreen Domit, Claudia Clark, Therese Chavarria Townsend, Bernadine Burich, Wanda Dewyer, Dawnetta Dodge, and Kimberly Fisher.[3] Consequently, 3M argues that summary judgment in its favor is proper on these Plaintiffs' claims.
Because Plaintiffs are relying on the theory that their breast implants were defective, they must prove that 3M played a role in the manufacture and/or sale of the implants. See Restatement (Second) of Torts § 402A;[4]Dillard Dep't Stores, Inc. v. Associated Merchandising Corp., 162 Ariz. 294, 782 P.2d 1187, 1191 (Ariz.Ct.App.1989). 3M notes that the undisputed evidence is that McGhan III manufactured and sold the breast implants to the Plaintiffs. In fact, Plaintiffs do not contest this point. Instead, Plaintiffs' opposition brief is devoted to the theories of negligent design and fraud. However, because of the many different theories of recovery included in Plaintiffs' Complaint, the Court will address the merits of each claim separately.

1. Strict Products Liability
Strict products liability may only be asserted against a defendant who is responsible for placing a product into the stream of commerce. See Torres v. Goodyear Tire & Rubber Co., 163 Ariz. 88, 786 P.2d 939, 943 (Ariz.1990) (in banc); Dillard Dep't Stores, Inc., 782 P.2d at 1189, 1191. Thus, if 3M played no role in the manufacture or the sale of Plaintiffs' breast implants, 3M cannot be strictly liable. See Vega v. Griffiths Constr., Inc., 172 Ariz. 46, 833 P.2d 717, 719 (Ct.App. 1992). Plaintiffs do not dispute that McGhan III is the company which manufactured and sold their implants. Thus, although McGhan III may potentially be held strictly liable for any alleged defects, 3M cannot be liable. Accordingly, Plaintiffs' strict liability claims against 3M, contained in Count I of the Second Amended Complaint, must be dismissed.

2. Negligence
Under Arizona law, a plaintiff asserting a negligence claim must establish that the defendant owed the plaintiff a duty, the defendant breached that duty, and that *873 the breach proximately caused the plaintiff's injury. See Robertson v. Sixpence Inns of Amer., Inc., 163 Ariz. 539, 789 P.2d 1040, 1044 (1990) (in banc). The primary issue in the present motion is whether 3M owed any duty to the Plaintiffs. Arizona courts have held that a party does not owe a duty of care to a person with whom one has no relationship. See Callender v. MCO Properties, 180 Ariz. 435, 885 P.2d 123, 130-31 (Ct.App.1994). Here, even though McGhan III manufactured and sold Plaintiffs their implants, Plaintiffs wish to hold 3M liable for McGhan III's alleged negligence. Because 3M never had any relationship with the Plaintiffs, it never owed Plaintiffs any duty. Consequently, Plaintiffs' negligence actions against 3M, with respect to the manufacture and sale of the implants, are dismissed.
Plaintiffs now contend, however, that 3M remains liable for negligent design of the relevant implants.[5] Arizona law provides that "manufacturers and sellers" may be liable for a defectively designed product if the "manufacturer could have feasibly made the product safer." Dart v. Wiebe Mfg., Inc., 147 Ariz. 242, 709 P.2d 876, 877 (Ariz.1985) (in banc); see also Gomulka v. Yavapai Mach. & Auto Parts, Inc., 155 Ariz. 239, 745 P.2d 986, 988 (Ct.App.1987). Moreover, the court must focus on "the reasonableness of the manufacturer's choice of design in light of the knowledge available at the time of manufacture." Id. at 881-82. Using this analytical framework, it is difficult to see how 3M could be liable for the negligent design of Plaintiffs' implants. McGhan III was the manufacturer; thus, it was McGhan III who made the choice of which design to use. At the time the implants were manufactured, 3M was no longer involved in the business.
However, Plaintiffs assert that the implants manufactured and sold by Mcghan III were identical to those designed, manufactured, and sold while 3M owned the breast implant business. Thus, according to Plaintiffs, even if McGhan III manufactured and sold the implants, 3M remains liable because it designed the implants. In support of this argument, Plaintiffs cite Jack Frost, Inc. v. Engineered Bldg. Components Co., 304 N.W.2d 346 (Minn.1981).[6] There, the court upheld a verdict finding that the designer of roof trusses was partially responsible for the roof's collapse. See id. at 351. Central to the court's reasoning was the fact that the designer had knowledge of the intended use of the trusses based on specific communications from the manufacturer. See id.
The designer in Jack Frost was employed to design trusses for a specific type of chicken barn. Expert testimony established that it was good engineering practice for a designer to learn how the user of the trusses would suspend loads from the trusses. Further, the manufacturer's manager testified that he informed the designer of this information. Ultimately, the trusses failed and the barns collapsed. The court refused to overturn the jury's verdict finding the designer at least partly liable. See id.
3M's actions in the present case differ substantially from the designer's in Jack Frost. The trusses in Jack Frost were designed specifically for the plaintiffs' type of chicken barns. Additionally, the trusses were designed by a company which was in the business of providing construction designs. There is no evidence to suggest that 3M was in the business of providing designs for breast implants. Admittedly, 3M designed implants for its own use. But 3M never sold breast implant designs to other companies, nor does Plaintiffs allege that 3M designed the implants specifically for Plaintiffs.
Moreover, while 3M may have designed implants prior to 1984, once it sold the breast implant division to McGhan III, it no longer had any control over the design. See Fricke v. Owens-Corning Fiberglas Corp., 618 So.2d 473, 475 (La.Ct.App.1993). The Fricke court held that a defendant could not be held liable for implementing an inadequate warning *874 when the warning was sold to a new owner at the time the business was sold. See id. After that point, the predecessor could no longer be required to warn plaintiffs. See id.; see also McCarthy v. McGhan Med. Corp., Civ. 94 L 7366 (Cook County Cir.Ct. Feb. 27, 1998) (order granting summary judgment in 3M's favor because the plaintiffs offered no evidence to show that 3M designed the relevant breast implants).
While the Court recognizes that the Fricke case involves product warnings, and not product designs, the Court does not see why its reasoning should not be extended to the present case. Thus, although Plaintiffs assert that McGhan III continued to use 3M's initial breast implant design, once the product line was sold to McGhan III, the design was sold as well. Furthermore, Plaintiffs have cited no cases to support their theory of "predecessor liability." Accordingly, the Court holds that 3M cannot be liable for negligent design with respect to Plaintiffs' implants because McGhan III designed, manufactured, and sold the implants.
Having determined that Plaintiffs' negligence claims against 3M fail, it follows that Plaintiffs can have no res ipsa loquitur claim. Arizona law allows a res ipsa loquitur claim only if the cause of the accident is "within the exclusive control of the defendant." Cox v. May Dep't Store Co., 183 Ariz. 361, 903 P.2d 1119, 1122 (Ariz.Ct.App. 1995). 3M sold the breast implant business to McGhan III in 1984, and the Plaintiffs received their implants after this date. Therefore, 3M never had exclusive control over Plaintiffs' implants. In fact, 3M had no control over them. Accordingly, Plaintiffs' res ipsa loquitur claim against 3M is dismissed.

3. Failure to Warn
Plaintiffs assert that 3M is also liable for failing to provide adequate warnings or instructions on the breast implants. Arizona law provides that such a claim is governed by sections 402A and 388 of the Restatement (Second) of Torts. See Anguiano v. E.I. Du Pont De Nemours & Co., 44 F.3d 806, 811 (9th Cir.1995). Section 402A allows a manufacturer to be liable for failure to warn, while section 388 allows a supplier to be liable for the same. See id. at 811-12. Because 3M did not manufacture or supply Plaintiffs' breast implants, 3M had no duty to warn Plaintiffs of the implants' alleged defects. Therefore, Plaintiffs' failure to warn claims against 3M are dismissed.

4. Breach of Express and Implied Warranties
Plaintiffs' implied warranty claim is controlled by section 2-314 of Arizona's Uniform Commercial Code ("UCC"). See Ariz.Rev.Stat. § 47-2314. However, in Flory v. Silvercrest Industries, Inc., 129 Ariz. 574, 633 P.2d 383, 387 (Ariz.1981) (in banc), the Arizona Supreme Court held that a claim for breach of an implied warranty first requires that the defendant be in either the manufacturing or distributing chain of the product in question. In the present case, 3M neither manufactured nor sold Plaintiffs' breast implants. Therefore, 3M was not in the manufacturing or distributing chain, and Plaintiffs' implied warranty claims against 3M must be dismissed.
Section 2-313 of the UCC governs Plaintiffs' express warranty claims. See Ariz.Rev.Stat. § 47-2313. This section provides that an express warranty exists when a seller makes an "affirmation of fact or promise" to the buyer. Id. § 47-2103 then defines "seller" as "a person who sells or contracts to sell goods." Ariz.Rev.Stat. § 47-2103. Because McGhan III manufactured and sold Plaintiffs' implants, 3M is not the "seller" as defined under the Uniform Commercial Code. Moreover, Plaintiffs do not allege that 3M made any express affirmations to them regarding the implants. Thus, Plaintiffs' express warranty claims against 3M must be dismissed.
Plaintiffs also allege a claim for implied warranty of fitness for a particular purpose. Such a warranty applies when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Ariz.Rev.Stat. § 47-2315. Here again, 3M does not satisfy *875 the UCC's definition of "seller" under § 47-2103. Consequently, Plaintiffs' claims against 3M for implied warranty of fitness for a particular purpose are dismissed.
As a final note, Plaintiffs also allege two other claims under the Uniform Commercial Code. First, Plaintiffs allege that 3M breached the UCC. Second, Plaintiffs assert that 3M is liable for negligence per se for UCC violations. However, the Court has already determined that 3M is not a "seller" under the UCC's definition and that 3M did not violate either the express or implied warranty provisions of the UCC. As such, Plaintiffs have no claim against 3M for breach of the UCC or for negligence per se under the UCC. Thus, the Court dismisses these claims.

5. Negligence Per Se/Food, Drug & Cosmetic Act
Negligence per se that is based on the breach of a safety statute requires that Plaintiffs show both a breach of a safety statute and that the breach proximately caused Plaintiffs' injuries. See Hebert v. Club 37 Bar, 145 Ariz. 351, 701 P.2d 847, 849 (Ct.App.1984). The Food, Drug and Cosmetic Act allows criminal liability to be placed upon "responsible corporate officials who ... have the power to prevent or correct violations of its provisions." United States v. Park, 421 U.S. 658, 676, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); see also 21 U.S.C. § 331. Because it is undisputed that 3M neither manufactured nor sold the breast implants at issue, 3M cannot be said to have had the power to prevent any alleged violations of the Food, Drug and Cosmetic Act. Thus, 3M could not have breached the Act, and Plaintiffs' negligence per se allegations based on this Act are dismissed as against 3M.

6. New York General Business Law
Section 392-b of the New York General Business Law makes it a misdemeanor for a person to place a false description on a product or to sell a product knowing that the product is falsely described. See N.Y.Gen.Bus.Law § 392-b. Because 3M did not manufacture the implants, it could not have placed a false description on them. Similarly, because 3M did not sell the implants to the Plaintiffs, it could not have sold Plaintiffs' implants knowing that they were falsely described. Accordingly, Plaintiffs' claims against 3M under the New York General Business Law are dismissed.

7. False Advertising Claim
Plaintiffs' state law false advertising claim falls under Arizona Revised Statute section 44-1522, the Arizona Consumer Protection Act. This Act requires that a plaintiff show that any damages suffered were a direct result of the defendant's unlawful acts. See Waste Mfg. & Leasing Corp. v. Hambicki, 183 Ariz. 84, 900 P.2d 1220, 1224 (Ariz.Ct.App.1995) (noting that the Act's purpose is to provide a remedy for injured consumers). The unlawful actions covered by the statute are those committed in connection with the sale or advertising of a product. See id. at 1223. Here again, Plaintiffs' claim must be dismissed because it is undisputed that 3M did not manufacture, sell, or advertise the relevant implants.

8. Conspiracy/Concert of Action
Plaintiffs allege that all Defendants conspired among themselves, and that Plaintiffs were injured as a result of this conspiracy. However, Arizona law does not recognize a separate action for civil conspiracy. See Tovrea Land & Cattle Co. v. Linsenmeyer, 100 Ariz. 107, 412 P.2d 47, 63 (Ariz.1966) (in banc). Therefore, this claim is barred as a matter of law and must be dismissed.
3M also asserts that Plaintiffs' concert of action claim must be dismissed because 3M "committed no unlawful, wrongful or tortious act" against Plaintiffs, nor did 3M have any "knowledge of the intent or purpose" of any other tortfeasor who injured Plaintiffs. Ramirez v. Chavez, 71 Ariz. 239, 226 P.2d 143, 146 (Ariz.1951). The Court agrees with Defendant. As previously discussed in this Order, 3M committed no tortious acts against Plaintiffs. Moreover, once 3M sold the breast implant business to McGhan III, 3M had no control over McGhan III's actions. Thus, 3M had no knowledge of McGhan III's intent. Therefore, Plaintiffs' *876 claim for concert of action against 3M is dismissed.

9. Market Share Liability
Plaintiffs attempt to hold 3M liable on the basis of their market share in breast implants. This claim cannot stand because Arizona courts do not recognize a market share cause of action. See White v. Celotex Corp., 907 F.2d 104, 106 (9th Cir.1990). Consequently, this claim against 3M is dismissed.

10. Emotional Distress
Plaintiffs allege that 3M is liable for both intentional and negligent infliction of emotional distress. A claim of intentional infliction of emotional distress requires that a plaintiff show "extreme or outrageous" conduct by a defendant, which then resulted in emotional injury to the plaintiff. Mintz v. Bell Atl. Sys. Leasing Int'l, Inc., 183 Ariz. 550, 905 P.2d 559, 562-63 (Ariz.Ct.App.1995). 3M did not manufacture or sell Plaintiffs their implants, nor have Plaintiffs alleged any other contact between themselves and 3M. Therefore, 3M could not have engaged in extreme or outrageous conduct towards Plaintiffs, and the intentional infliction of emotional distress claim against 3M is dismissed.
Under Arizona law, a claim for negligent infliction of emotional distress requires three elements. Following the defendant's negligent action, the plaintiff must "(1) witness an injury to a closely related person, (2) suffer mental anguish manifested as physical injury, and (3) be within the zone of danger so as to be subject to an unreasonable risk of bodily harm created by the defendant." Pierce v. Casas Adobes Baptist Church, 162 Ariz. 269, 782 P.2d 1162, 1165 (Ariz.1989) (in banc). As established above, 3M did not engage in any negligent acts with respect to Plaintiffs' implants because 3M neither sold nor manufactured the implants. Thus, 3M did not create an unreasonable risk of bodily harm with respect to the implant recipients. Therefore, Plaintiffs' negligent infliction of emotional distress claim against 3M must be dismissed.

11. Fear of Future Product Failure
As with Plaintiffs' civil conspiracy claim, Plaintiffs' claim for fear of future product failure cannot stand because such a claim is not recognized by Arizona courts. Moreover, even if such a claim were actionable, 3M could not be liable under this theory because 3M was not responsible for selling or manufacturing the implants at issue. Thus, this claim against 3M must also be dismissed.

12. Lanham Act
Plaintiffs allege that 3M violated the Lanham Act, and subsequently injured Plaintiffs. However, individual consumers do not have standing to assert violations of the Lanham Act. See 15 U.S.C. § 1125(a); Barrus v. Sylvania, 55 F.3d 468, 470 (9th Cir. 1995); Serbin v. Ziebart Int'l Corp., 11 F.3d 1163, 1179 (3d Cir.1993); Dovenmuehle v. Gilldorn Mortgage Midwest Corp., 871 F.2d 697, 701 (7th Cir.1989); Colligan v. Activities Club of N.Y., Ltd., 442 F.2d 686, 692-93 (2d Cir.1971). Because the present Plaintiffs are not "commercial entities," they have no standing, and their Lanham Act claims against 3M are dismissed.

13. Magnuson-Moss Act
The Magnuson-Moss Act applies to "consumer products." 15 U.S.C. § 2301(1). The Act defines "consumer products" to include "any tangible personal property which is distributed in commerce and which is normally used for personal, family or household purposes." Id. However, courts have held that surgically implanted medical devices are not "consumer products" under the Act because they "are not customarily available to the ordinary person." Kemp v. Pfizer, Inc., 835 F.Supp. 1015, 1024-25 (E.D.Mich.1993); see also Goldsmith v. Mentor Corp., 913 F.Supp. 56, 63 (D.N.H.1995). The Court adopts the reasoning of Kemp and Goldsmith and holds that Plaintiffs' breast implants do not constitute "consumer products" under the Act because these implants are not readily accessible to all consumers. Accordingly, Plaintiffs' Magnuson-Moss Act claims against 3M must be dismissed.

*877 14. Joint Venture; Aider/Abettor Claims

Plaintiffs' remaining products liability claims against 3M rely on the premise that 3M acted together with McGhan. First, Counts 21 and 22 allege that 3M and McGhan participated in a joint venture and/or operated as a parent/subsidiary. However, Plaintiffs offer no facts to support this theory. Plaintiffs do not dispute that 3M sold the breast implant business to McGhan III in 1984, nor do they dispute that the two companies were operated as independent companies. Essentially, Plaintiffs' entire argument on this issue stems from their belief that 3M was actually controlling McGhan III, and that McGhan III was a sham corporation set up for the sole purpose of 3M avoiding liability. As discussed more fully below, the Court determines that the evidence does not support such a theory. Accordingly, Plaintiffs' claims against 3M relating to joint ventures and parent subsidiaries are dismissed.
Second, Plaintiffs have asserted claims for alter ego and/or aider/abettor liability. Arizona law imposes alter ego/controlling person liability if there is "such unity of interest and ownership that the separate personalities of the corporation and owners cease to exist." Dietel v. Day, 16 Ariz.App. 206, 492 P.2d 455, 457 (Ariz.Ct.App.1972) (citations omitted). Although many factors may be considered to determine whether this unity of interest is present, the general focus is on whether the corporations act independently, or whether they act as one entity. See Deutsche Credit Corp. v. Case Power & Equip. Co., 179 Ariz. 155, 876 P.2d 1190, 1195-96 (Ct.App.1994). The Court finds that 3M and McGhan III operated independently of one another. The two corporations shared no officers or directors, and neither corporation had control over the operations of the other. Additionally, as pointed out by 3M, since 1985, McGhan III has been a wholly-owned subsidiary of INAMED, a publicly traded corporation. Plaintiffs do not allege that INAMED is liable under this theory; if INAMED is not liable under this theory, neither can 3M be. Thus, the Court finds that 3M cannot be held liable under an alter ego theory.
Plaintiffs' alternative theory is that of aiding and abetting. Under Arizona law, this cause of action consists of the following elements: "(1) the existence of an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong." In re Amer. Continental Corp./Lincoln Sav. & Loan Sec. Litig., 782 F.Supp. 1382, 1384-85 (D.Ariz.1991) (citing Harmsen v. Smith, 693 F.2d 932, 943 (9th Cir.1982)). Plaintiffs allege that the wrongful acts committed by McGhan III are its concealment of the risks and defects associated with breast implants, its failure to perform safety tests, and its misrepresentation of silicone implants to the FDA. Even assuming that these wrongful acts occurred, the Court cannot find 3M to be an aider/abettor.
Plaintiffs rely on facts involving 3M's conduct well before the sale of the breast implant division in 1984. For example, Plaintiffs discuss the extent of 3M's due diligence investigation when it initially purchased the division in 1977, 3M's own testing of the product while it still owned the division, and the extent of 3M's own disclosures to the FDA while it still owned the division. However, none of these facts has any relevance to whether 3M aided and abetted McGhan III's alleged tortious wrongdoing after 1984.
Even assuming that 3M sold the division knowing that the breast implants were defective and posed health hazards, Plaintiffs have inadequate factual support for their assertion that 3M somehow acted in concert with McGhan III after the divestiture. Admittedly, 3M allowed McGhan III to purchase the implant division on credit, and 3M also reorganized the debt twice following the 1984 sale. However, as this Court noted in In re TMJ Implants Prods. Liab. Litig., 880 F.Supp. 1311, 1319-20 (D.Minn.1995), aff'd, 113 F.3d 1484 (8th Cir.1997), the fact that 3M provided transition services to McGhan III does not rise to the level of substantial assistance. Moreover, none of the services 3M provided to McGhan III involved the purported wrongful acts committed by McGhan III. Accordingly, the Court holds that 3M did not aid and abet McGhan III, and Plaintiffs' *878 claims of alter ego and/or aider/abettor liability against 3M are dismissed.

15. Miscellaneous Claims
Plaintiffs' Complaint includes a claim for violation of state consumer protection statutes/negligence per se. However, Plaintiffs have cited no specific consumer protection statute which was allegedly violated by 3M. Therefore, this claim against 3M is dismissed.
Plaintiffs also assert a claim for common plan to prevent public awareness of breast implant hazards. Plaintiffs' brief does not discuss this issue. The Court finds that the allegations to support such a claim would mirror Plaintiffs' fraudulent concealment allegations. As discussed more fully below, the Court finds that 3M did not fraudulently conceal the hazards of silicone breast implants. See infra § D.2. It follows that 3M could not be liable for participating in a common plan to conceal these hazards. Accordingly, this claim made by Plaintiffs against 3M is dismissed.
Additionally, Plaintiffs' Complaint contains a claim for invalidity of indemnification agreements. Again, the parties' briefs do not discuss this claim. The Court concludes that Plaintiffs are attempting to assert that the indemnification agreement between 3M and McGhan III is invalid because 3M was negligent. A party can not be indemnified against its own negligence unless the agreement specifically provides for it. See Hauskins v. McGillicuddy, 175 Ariz. 42, 852 P.2d 1226, 1234 (Ariz.Ct.App.1992). Although the term "negligence" need not be used in the indemnification clause, courts do require that the intention to indemnify against negligence be "expressed in clear and unequivocal terms." See Washington Elementary Sch. Dist. No. 6 v. Baglino Corp., 169 Ariz. 58, 817 P.2d 3, 6 (1991) (en banc) (holding that rule invalidating indemnity agreements cannot be mechanically applied because to do so could alter the intent of the contracting parties).
The present indemnity agreement between McGhan III and 3M provides for McGhan III to acquire the breast implant business assets "free and clear of all ... liabilities ... including without limitation ... any and all claims made prior to the Closing Date for negligence or for product liability relating to the Plastic Surgery Business." (Dunleavy Aff.Ex. 52 at 11.) This clause logically implies that the parties intended 3M to be liable for negligence claims made prior to the divestiture. It then follows that McGhan III was to assume liability for claims made after the divestiture, such as the claims made by Plaintiffs. The Court finds the indemnity clause to be clear and unambiguous, and therefore dismisses Plaintiffs' claims against 3M asserting that the clause is invalid.

D. Fraud Claims
Plaintiffs' several fraud claims against 3M essentially allege that 3M's divestiture of its breast implant business to McGhan III was fraudulent because it was done with the sole intent of avoiding potential liability for defective implants. Plaintiffs assert that McGhan III was simply a "shell" created for the purpose of having a shallow pocketed corporation subject to liability. Plaintiffs allege three main fraud claims: fraudulent misrepresentation, fraudulent concealment, and fraudulent transfer. As noted earlier, these claims are governed by Minnesota law.

1. Fraudulent Misrepresentation
In Minnesota, a claim for fraudulent representation must include the following five elements:
(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge;
(2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false;
(3) with the intention to induce another to act in reliance thereon;
(4) that the representation caused the other party to act in reliance thereon; and
(5) that the party suffer pecuniary damage as a result of the reliance.
Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn.1986) (citing Burns v. *879 Valene, 298 Minn. 257, 214 N.W.2d 686, 689 (Minn.1974); Davis v. Re-Trac Mfg. Corp., 276 Minn. 116, 149 N.W.2d 37 (1967)). Central to the definition of a fraudulent misrepresentation is that a plaintiff receives and relies on a false representation. See American Computer Trust Leasing v. Boerboom Int'l, Inc., 967 F.2d 1208, 1212-13 (8th Cir. 1992) (representation); Davidson v. Wilson, 763 F.Supp. 1470, 1472 (D.Minn.1991) (reliance). Plaintiffs point to the following two statements 3M made in conjunction with its divestiture of the breast implant business.
First, 3M issued a press release on August 7, 1984. This press release stated, "The business was sold because it was not consistent with the Division's future growth targets. ... We feel the new owners have the ability to continue 3M's strong quality orientation and service support to the business." (Dunleavy Aff.Ex. 60.) Second, on August 10, 1994, W.J. Lynch, 3M's national sales manager, sent a letter to all 3M/McGhan customers informing them of the sale. In the letter, customers were told, "This change will provide you with specialized sales coverage and service to meet your silicone product needs." (Id. Ex. 61.) According to Plaintiffs, both of these statements were false because 3M knew that the true reason for the divestiture was to avoid liability.
Plaintiffs rely on Kociemba v. G.D. Searle & Co., 707 F.Supp. 1517 (D.Minn.1989). In Kociemba, the defendant's representatives made two statements to the plaintiff's physician regarding the safety of a product. One representative told the doctor that the medical device was "excellent for use" with patients such as the plaintiff. Id. at 1524. The other told the doctor that the device was "safe and effective." Id. Even though the representation stating that the product was "excellent" would normally be considered an opinion, the court held that because the defendant had "special knowledge of the subject," the court could consider it as a representation of fact. Id. at 1525. The court also noted that the statement was not a general one, but instead one focusing on a "specific subgroup of patients" such as the plaintiff. Id. Accordingly, the court declined to overturn the jury's verdict that the defendant was liable for fraudulent misrepresentation.
As for the statement regarding the safety of the medical device, the Kociemba court noted that a claim for intentional misrepresentation can also be established "by showing that the defendant concealed a material fact, knowing that the plaintiff would act on the presumption that no such fact existed." Id. at 1526 (citing Rochester Methodist Hosp. v. Travelers Ins. Co., 728 F.2d 1006, 1018 (8th Cir.1984)). Such a claim is especially warranted when the defendant has special knowledge of these material facts, and when the plaintiff does not have access to these facts. See id. (citing Tetuan v. A.H. Robins Co., 241 Kan. 441, 738 P.2d 1210, 1228 (1987)). Thus, the court again declined to overturn the jury's verdict that the defendant intentionally misrepresented the safety of its medical device by concealing a material fact. See id.
The Court finds the present case distinguishable from Kociemba. In Kociemba, the plaintiffs were able to point to specific statements made to specific persons. Statements made by a pharmaceutical representative directly to a physician should be expected to be relied upon. In contrast, 3M's press release statement was a general statement made to the public. It was not directed at Plaintiffs or their physicians, and nothing in the statement suggests that it was made with the intent of having Plaintiffs somehow rely on the statement when deciding to receive breast implants. Rather, the statement is best considered as "puffing." It is true that the Kociemba court cautioned against allowing puffing by a pharmaceutical dealer when discussing a product intended to be placed in the human body. See id. at 1525. However, the subject of 3M's press release was not the breast implant products themselves, but instead the sale of that product line to McGhan III. The Court finds that the press release by 3M was akin to statements many companies make in similar situations and, in fact, was probably aimed more at 3M's investors as an explanation for why the implant business was sold. As such, the press release cannot be a basis for a fraudulent misrepresentation claim by Plaintiffs.
*880 The second statement by 3M, the letter sent to 3M/McGhan customers, assured the customers that the sale of the implant business would provide those customers with specialized sales and service. Again, Plaintiffs assert that they, "through their physicians, were entitled to rely on 3M's statement that their needs would be `better serviced' by McGhan [III]." (Pls.' Mem. Opp'n at 31.) Again, this statement differs from the statements made by the pharmaceutical representatives in Kociemba. While the letter is a more direct form of representation than 3M's press release, the letter did not discuss the safety of the breast implants. Instead, the letter assures customers that the sale will not impact customer service for the product line. Plaintiffs would like to equate "better service" with "safe, non-defective implants." However, regardless of whether the Plaintiffs received defective implants, nothing in the letter from 3M amounts to a representation upon which a reasonable person would rely when deciding whether to purchase implants or whether these implants are safe. Therefore, Plaintiffs cannot base their fraudulent misrepresentation claim on 3M's letter to its customers, and Plaintiffs' fraudulent misrepresentation claims against 3M are dismissed.

2. Fraudulent Concealment
Plaintiffs also allege that 3M concealed material facts about the risks and defects associated with silicone breast implants. Generally, a claim for fraudulent concealment is asserted when a plaintiff believes that the defendant concealed facts giving rise to a cause of action. See Haberle v. Buchwald, 480 N.W.2d 351, 357 (Minn.Ct. App.1992). If the claim is successful, the statute of limitations is then tolled. See id. This does not appear to be what Plaintiffs in the present case are asserting. Instead, Plaintiffs contend that 3M committed a "fraudulent misrepresentation" when it "concealed material facts about the lack of safety testing it had conducted, its knowledge that the FDA would be requiring such testing, and the defects and injuries of which it had received notice." (Pls.' Mem. Opp'n at 31.)
Fraud based on the concealment of a material fact occurs when one party knowingly conceals a material fact which is "peculiarly within his own knowledge," and the other party relies on the presumption that the fact does not exist. Richfield Bank & Trust Co. v. Sjogren, 309 Minn. 362, 244 N.W.2d 648, 650 (Minn.1976). However, central to such a claim is that "there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him." Id.; see also Masepohl v. American Tobacco Co., 974 F.Supp. 1245, 1250 (D.Minn.1997) (citing American Computer Trust Leasing v. Jack Farrell Implement Co., 763 F.Supp. 1473, 1486 (D.Minn.1991)). Such an obligation to disclose arises "(1) where one party owes a fiduciary duty to the other; or (2) where the circumstances are such that failure to disclose renders misleading statements which have already been made." American Computer Trust Leasing, 763 F.Supp. at 1486 (citations omitted).
Even if the Court accepts Plaintiffs' assertion that 3M had special knowledge concerning the safety of the breast implants, Plaintiffs have alleged no fiduciary relationship between 3M and themselves, or between 3M and the Plaintiffs' physicians, which would give rise to a duty on the part of 3M. 3M was no longer in the business of manufacturing or selling breast implants in 1984. Moreover, 3M could not have known that the Plaintiffs were contemplating purchasing the implants. Finally, any allegations Plaintiffs have made regarding 3M's actions prior to its sale of the implant business do not change the central fact that 3M never owed these Plaintiffs' a duty of disclosure. Accordingly, because 3M owed no duty to disclose any information to Plaintiffs or their physicians, Plaintiffs' fraudulent concealment claims against 3M are dismissed.

3. Fraudulent Transfer
The Minnesota Uniform Fraudulent Transfer Act ("UFTA") prohibits debtors from transferring property or incurring obligations with the intent to hinder, delay or defraud creditors. See Minn.Stat. *881 §§ 513.41-513.51; New Horizon Enters., Inc. v. Contemporary Closet Design, Inc., 570 N.W.2d 12, 14 (Minn.Ct.App.1997). Plaintiffs correctly point out that the UFTA is to be liberally construed. See Lind v. O.N. Johnson Co., 204 Minn. 30, 282 N.W. 661, 667 (Minn.1938); Xemas, Inc. v. United States, 689 F.Supp. 917, 922 (D.Minn.1988). As a preliminary matter, Plaintiffs have not asserted that 3M's divestiture of the implant business left 3M insolvent and unable to meet its obligations. Additionally, the Court does not find the necessary "badges of fraud" present. Section 513.44(b) contains a list of possible "badges of fraud" which indicate that a party entered a transaction with the intent to hinder creditors. See Minn.Stat. § 513.44(b). Plaintiffs assert that the following "badges of fraud" are present: the transfer was to an insider, the transfer was made to avoid future liability, 3M concealed the true reasons for the transfer, and McGhan III was rendered insolvent shortly after incurring the debt. (See Pls.' Mem. Opp'n at 41-43.)

a. Transfer to an Insider
The UFTA provides that, when determining whether a transferor actually had the intent to hinder creditors, the court may consider whether the transfer was made to an insider. See Minn.Stat. § 513.44(b)(1). According to Plaintiffs, because 3M sold the implant business to Don McGhan, the person who originated the breast implant line, it was a transfer to an insider. However, neither Don McGhan individually nor McGhan III qualifies as an insider under the UFTA's definition. See Minn.Stat. § 513.41(7).[7] McGhan III certainly does not qualify as a corporation which is in control of 3M. To the contrary, even Plaintiffs admit that 3M is a much larger and more powerful corporation than McGhan III. Thus, Plaintiffs' assertion amounts to a claim that the sale was to McGhan III as an insider/affiliate. However, 3M's only affiliation with McGhan III was the sale of the breast implant business to it. It is true that a different McGhan company once owned the breast implant business. But Plaintiffs cannot extrapolate from the similarity of the two companies' names the conclusion that they are somehow now affiliates of 3M's. Because McGhan III did not possess any control over 3M, and because there was no prior affiliation between the two companies before the transaction, McGhan III was not an insider to the transaction.

b. Avoiding Future Liability
When determining whether a fraudulent transfer has occurred, a court may also consider whether "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." Minn. Stat. § 513.44(b)(4). In support of this contention, Plaintiffs point to a memorandum written by Thomas Boardman, of 3M's office of general counsel, on May 7, 1984. This memorandum noted that 3M had received three letters of intent which contained offers to purchase the implant business. (See Dunleavy Aff.Ex. 48 at 1.) The memorandum concluded that "liability for the product line ... will continue in the future unless significant technological advances are made," and thus recommended an expeditious sale of the business. (Id. at 3.)
This memorandum is definitely a recognition that 3M had been sued in the past, and that it would likely be sued in the future. Further 3M admits that it sold the division to "avoid the creation of new claims against it if it continued in the breast implant business." (Def.'s Reply Mem. at 20.) However, the key issue is whether 3M was attempting to avoid liability altogether, thus leaving potential claimants with no one to sue. In fact, when the sale to McGhan III was consummated, 3M obtained an indemnity agreement only for those implants manufactured and sold by McGhan III. Thus, 3M *882 remained liable for those implants it did manufacture and sell. In short, Plaintiffs have not proffered any reliable evidence to indicate that 3M's divestiture of the breast implant business occurred solely for 3M to completely avoid liability for alleged defects in the implants.

c. Concealment of Reasons for Transfer
Plaintiffs also assert that 3M concealed the true reasons for the implant business divestiture because it failed to notify the FDA and the medical community that liability concerns prompted the sale of the business. In support of this "badge of fraud," Plaintiffs point to section 513.44(b)(3). Plaintiffs note that this section refers to when "circumstances of transfer are concealed." (Pls.' Mem. Opp'n at 42 (emphasis added).) However, Plaintiffs have misread the statute and, in fact, added a word to it. The statute merely states that the court should consider whether "the transfer or obligation was disclosed or concealed." Minn.Stat. § 513.44(b)(3). Nowhere does this section discuss the circumstances of a transaction. Thus, a fair reading of this statute leads to the conclusion that what this Court must consider is whether 3M and McGhan III concealed the actual sale of the breast implant business. The parties' motives for the transaction are irrelevant, at least with respect to this "badge of fraud." Because it is undisputed that the actual sale of the implant business was publicly disclosed, the Court does not find this "badge of fraud" present.

d. Insolvency
Plaintiffs' final assertion is that 3M's divestiture of the breast implant business left McGhan III an insolvent corporation, unable to satisfy breast implant liability issues. However, the applicable statute states that a court may consider whether "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." Minn.Stat. § 513.44(b)(9). In this context, the "debtor" making the transfer would be 3M, not McGhan III. Plaintiffs have not alleged that 3M was insolvent at the time of the divestiture, or that it became insolvent at any time thereafter. Moreover, McGhan III's alleged insolvency is irrelevant.
In summary, the Court finds no merit in Plaintiffs' allegations that several "badges of fraud" tainted 3M's sale of the breast implant business to McGhan III. In fact, it defies logic to imagine how 3M, a multi-million dollar company, could become insolvent upon selling one of its divisions for $5.5 million. Because the Court finds none of the alleged "badges of fraud" present, the Court dismisses Plaintiffs' fraudulent transfer claims against 3M.

CONCLUSION
Plaintiffs' claims against 3M must be dismissed because 3M did not design, manufacture, or sell the breast implants which caused Plaintiffs' injuries. Further, the Court finds that 3M did not commit fraud when it divested itself of the breast implant business, Finally, because all of Plaintiffs' substantive claims against 3M are dismissed, the Court must also grant summary judgment on Plaintiffs' claims for collateral estoppel/res judicata, declaration regarding punitive damages limitations, and punitive damages.
Accordingly, IT IS HEREBY ORDERED THAT:
1. Defendant 3M's Motion for Summary Judgment (Clerk Doc. No. 77) is GRANTED; and
2. The following Plaintiffs' claims against Defendant 3M are DISMISSED: Kathy Ann Dale, Robert Dale, Peggy Lee Rubie, Susan A. Suftko, Gerald B. Suftko, Nan Marie Swanson, Mark J. Swanson, Nancy Anne Wold, Sherry Beth Worden, Steven Worden, Carrie Elizabeth Winter, Opelia S. Aparicio, Robert A. Aparicio, Sylvana Anderson, Margie A. Brooks, Doreen Domit, Claudia Clark, Jeffrey W. Clark, Therese Chavarria Townsend, Bernadine Burich, Wanda Dewyer, Arthur D. Dewyer, Dawnetta Dodge, Stan D. Dodge, and Kimberly Fisher.
NOTES
[1] 3M chose to move for summary judgment only with respect to the Arizona Plaintiffs solely to simplify the choice of law issue. 3M has not waived its right to move for summary judgment regarding the remaining Plaintiffs who purchased implant devices manufactured and sold by McGhan.
[2] The Court realizes that this decision results in two different states' laws being applied to the same case. However, if the Court were to adopt only 3M's argument for Arizona law, the end result would be that each Plaintiff's home state law would govern. The present decision of applying Minnesota law to the fraud-based claims lends at least some uniformity of law to all of the Plaintiffs' cases.
[3] Several of these Plaintiffs also have spouses who filed loss of consortium actions. Those Plaintiffs with such actions include Robert Dale, Gerald B. Suftko, Mark J. Swanson, Steven Worden, Robert A. Aparicio, Jeffrey W. Clark, Arthur D. Dewyer, and Stan D. Dodge.
[4] The Restatement provides as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
Restatement (Second) of Torts § 402A.
[5] The Court notes that Plaintiffs' Complaint does not contain a claim for negligent design. Plaintiffs, however, contend that their generic "negligence" claim includes a claim for negligent design. Thus, the Court will address the issue.
[6] Plaintiffs have provided no authority to demonstrate that Arizona has adopted the rationale of Jack Frost.
[7] Section 513.41(7) defines "insider" as follows:

(ii) if the debtor is a corporation,
(A) a director of the debtor;
(B) an officer of the debtor;
(C) a person in control of the debtor;
(D) a partnership in which the debtor is a general partner;
(E) a general partner in a partnership described in clause (D); or
(F) a relative of a general partner, director, officer, or person in control of the debtor....
(iv) an affiliate, or an insider of an affiliate as if the affiliate were the debtor. Minn.Stat. § 513.41(7).